808 P.2d 1329

STATE of Idaho, Plaintiff–Respondent,

v.

Douglas Ray ARLEDGE, Defendant–Appellant.

No. 18301.

Court of Appeals of Idaho.

Feb. 11, 1991.

Petition for Review Denied May 6, 1991.

Alan E. Trimming, Ada County Public Defender, Boise for defendant-appellant.

Jim Jones, Atty. Gen., Jack B. Haycock, Deputy Atty. Gen., for plaintiff-respondent.

SWANSTROM, Judge.

A jury found Douglas Arledge guilty of aggravated assault, second degree kidnapping, misdemeanor battery, and the use of a firearm in the commission of a crime. He was given concurrent sentences, the longest of which—for the kidnapping—was twenty-five years with a ten-year minimum period of incarceration. On appeal, Arledge contends the district judge erred: (1) by allowing the state to reveal to the jury that he had two prior felony convictions, (2) by admitting into evidence a written statement of a defense witness which referred to Arledge having been in jail, (3) by denying Arledge's motion for a new trial based on newly-discovered evidence, and (4) by sentencing him to such a lengthy period of incarceration. For reasons explained below, we affirm.

The testimony at trial was conflicting. The state presented one scenario of the events leading up to the time of the arrest, while the defendant and his witnesses presented another version. Where, as here, there was substantial competent evidence supporting the guilty verdicts, we must view that evidence most favorably to the prosecution. *State v. Fenley*, 103 Idaho 199, 646 P.2d 441 (Ct.App.1982). Accordingly, we summarize the evidence as follows.

On March 14, 1989, the victim, Troy Bell, was living in a house he owned on Constitution Way in Boise. Al Scott, an acquaintance of Bell, was also staying there for a few days. Bell had also permitted another acquaintance, Violet Faulkner, to move into the house with her sixteen-year old son when Faulkner could not pay the rent where she had been living. The duration of this arrangement is not clear from the record. At least some of Faulkner's belongings were in the house on March 14.

The evidence showed that on March 13, 1989, Faulkner picked up her fiance, Arledge, when he was released from jail, and brought him to Bell's home where he spent the night. Bell was acquainted with Ar-

ledge too, having gone to his home several times.

Bell testified that he was absent from his home on the night of March 13, having spent the night and most of the following morning with his girlfriend. He admitted that he had been using drugs and drinking. He testified that when he came home on the afternoon of March 14 at about 2:30 p.m. he went directly to bed. Scott testified that he was at Bell's house on March 14 when Bell came in and went upstairs to his bedroom.

Shortly thereafter, according to Scott, Arledge burst through Bell's front door and went upstairs to the bedroom. Scott could hear noises and angry shouting for a few minutes. Arledge then came down the stairs, carrying a sawed-off shotgun and ordered Scott to leave the house. He did so immediately.

Bell testified that he was awakened by Arledge grabbing his hair and hitting him in the face with his fists. After repeatedly hitting Bell, Arledge asked "where his gun was." Bell testified that he had previously placed a sawed-off shotgun belonging to Arledge beneath the bed. Before Bell could respond to Arledge's demand, Arledge saw the gun, picked it up, and held it against Bell's head while verbally threatening Bell. Later, while still in possession of the shotgun, Arledge forced Bell to drive him to another part of town. When they returned to Bell's house, Arledge took Bell to a crawl space beneath one level of the house and ordered him to stay there.

Later in the afternoon, Scott returned to the house to get some of his belongings. He was met at the door by Arledge. Arledge agreed to let Scott pick up his personal effects and both proceeded to the basement to get the items Scott had requested. While in the basement, Scott was able to see Bell sitting on the ground in the crawl space. He noticed that Bell was beaten up badly and his face was bleeding. Scott retrieved his personal belongings and left Bell's house. Scott then contacted the po-

lice and told them that something was wrong at Bell's residence.

Meanwhile, Faulkner and her son, Christopher Smith, arrived back at Bell's house after they had gone to a hospital where Faulkner was treated for an eye problem. Shortly thereafter, a police officer arrived at the home and was greeted by Arledge. The officer asked to see Bell, and explained that he had been informed of "foul play" at Bell's residence. Arledge told the officer that Bell had just left the home and that he did not know when he would return. Arledge also informed the officer that he was not aware of any altercation at the Bell residence.

Moments later, Bell crawled out of a basement window, yelling that he had been kidnapped and held against his will. At that point, the police officer ordered Arledge to come away from the house. He handcuffed Arledge for his protection and called for additional officers. After further investigation, Arledge was arrested and later charged with aggravated assault, second degree kidnapping, misdemeanor battery, and use of a firearm in the commission of a crime. A jury found him guilty of each of these charges, and this appeal followed.

## I

The first two issues we discuss are interrelated. Essentially, they are part of Arledge's contention that the district court erred by allowing the state to introduce evidence of other bad acts which had the effect of indicating to the jury he was a criminal with a propensity to commit crimes.

First, Arledge asserts the district judge erred by admitting into evidence a written statement from Faulkner, which referred to Arledge having been released from jail the day before the incident. The prosecutor offered the written statement into evidence for impeachment purposes, as a prior inconsistent statement of this defense witness. During cross-examination Faulkner had testified as follows:

Prosecutor: How long had Doug Arledge been staying at the residence on Constitution Way before the fourteenth day of March?

Faulkner: About two days.

In contrast, the written statement signed by Faulkner on the day of the incident, included the following sentence:

Doug had gotten out of jail yesterday (3–13–89/Monday) & I had picked him and brought him here 3553 Constitution Way where we have been residing.

Counsel for Arledge sought to exclude the phrase "Doug had gotten out of jail yesterday," on the grounds that it was unfairly prejudicial. Moreover, he argued that none of the provisions of I.R.E. 404(b) allowed the statement to be admitted. He also claimed the statement did not contradict Faulkner's trial testimony; and that, in any event, the prejudicial effect of admitting the statement far outweighed its probative value.

The district judge overruled the objection and held the statement was in "direct contradiction" to the testimony Faulkner had given in court. The district judge also stated that she had considered the option of redacting the objectionable phrase, but that there was no way to do that and have the statement make sense. Finally, the district judge concluded the probative value of the whole statement outweighed its prejudicial effect.

■ Our analysis of this issue begins with I.R.E. 404(b), which provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

This rule prohibits the use of this type of character evidence if it is offered to show a propensity to commit crimes. *State v. Mat-*

*thews,* 108 Idaho 482, 700 P.2d 104 (Ct.App. 1985). Counsel for Arledge argued the statement portrayed Arledge as a bad person who probably committed this crime; however, the stated purpose of the offer was to impeach Faulkner's testimony that Arledge had been living at Bell's house for "about two days" prior to March 14, 1989.

The list of exceptions to the general rule of I.R.E. 404(b) requiring exclusion are but examples. These "examples are not exclusive." G. BELL, HANDBOOK OF EVIDENCE FOR THE IDAHO LAWYER at 204 (3d ed.1987). Another permissible category not listed in Rule 404(b) is evidence offered for impeachment purposes. *See, e.g., People v. Guthreau,* 162 Cal.Rptr. 376, 102 Cal.App.3d 436 (1980); WRIGHT & GRAHAM, FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 5240 (1978). Therefore, we hold that while Rule 404(b) does not specifically authorize the statement to be used for impeachment purposes, neither does the rule prohibit such use.

■ Whether evidence of other bad acts or crimes may be admitted ultimately depends on whether a two-tiered test has been met. *See State v. Matthews, supra.* First, the evidence must be relevant to a material issue concerning the crime charged. *State v. Simonson,* 112 Idaho 451, 732 P.2d 689 (Ct.App.1987); I.R.E. 401, 402. Second, the probative value of the evidence must outweigh its prejudicial effect. *Id.;* I.R.E. 403. This balancing process is left to the sound discretion of the trial judge and will not be disturbed on appeal, unless that discretion has been abused. *State v. Winkler,* 112 Idaho 917, 736 P.2d 1371 (Ct.App.1987). Here, as in any case, whenever evidence is introduced for purposes of impeachment, it necessarily involves a witness' credibility, and credibility is always relevant. BELL, *supra,* at 197. Therefore, we need only determine whether the prejudicial effect of this statement outweighed its probative value. In this case, the statement did have probative value, because it showed that Faulkner's testimony may not be credible.

■ As we have indicated, the jury heard much disputed testimony at trial. Faulkner first testified that she and her son were living at Bell's house on March 14. She answered "yes" when asked whether Arledge was "residing there too." On cross-examination, she admitted that Arledge had been staying at Bell's house only "about two days" before the fourteenth. Her written statement given to police officers on the fourteenth showed that she brought Arledge to the residence sometime on the thirteenth. While this statement may not have been a "direct contradiction" to her trial testimony, it did take on importance because it was given contemporaneously with the critical events. It cast doubt upon Faulkner's testimony implying that Arledge was residing in the home up until the time of the incident. We conclude the trial judge did not abuse her discretion in deciding not to redact the phrase in the statement.

■ Other parts of the written statement were relevant for impeachment purposes as well. Faulkner testified that she was with Arledge at all times on the fourteenth and did not see him strike Bell at any time. She testified that Arledge accompanied her and her son to the hospital, to a friend's house and to a store on the fourteenth. Her testimony, if believed, provided an alibi for all of the charges against Arledge. The written statement tended to contradict or undermine critical parts of her trial testimony. We agree with the district judge that the probative value of the statement as a whole outweighed its prejudice.

II

Arledge contends that his unfair portrayal as a bad character was exacerbated when the trial judge allowed the state to introduce evidence, for purposes of impeachment, that Arledge had two prior felony convictions. Specifically, he argues that one conviction for lewd conduct should not have been admitted, because it is the

type of crime which has little or no bearing on truth or veracity. However, he later conceded that the second conviction, a burglary charge, was admissible for impeachment purposes.

The record reveals only that the state, on cross-examination, asked the defendant if he had been convicted of two felonies. Both of these convictions, however, were first exposed by counsel for the defense in an attempt to soften the impact of the disclosure. Apparently, this was done because the district judge had already ruled—at the outset of the trial, in the absence of the jury—that the state could use the convictions for impeachment purposes in the event the defendant testified. It should be noted, however, that the nature of the convictions was never discussed, either by the defense or by the state, in the presence of the jury.

█ On appeal, we will not presume error from an absent record. The appellant bears the burden of establishing a record, and presenting it on appeal to this Court. *State v. Murinko*, 108 Idaho 872, 702 P.2d 910 (Ct.App.1985). Here, Arledge has not provided us with a transcript of the hearing concerning the admissibility of these prior convictions. The court minutes contained in the record are insufficient for appellate review of this issue. Accordingly, we find no abuse of discretion in allowing the two convictions to be used for impeachment purposes.

### III

Arledge also contends the district judge erred by denying his motion for a new trial based on newly-discovered evidence. At trial, Arledge asserted an alibi defense to the charges brought against him. Faulkner and her son testified that Arledge was with them at the hospital the afternoon of the incident. In addition, both Faulkner and her son testified that Arledge did not hit Bell or threaten him with a shotgun after they returned from the hospital that afternoon. Despite this corroboration of

testimony, the jury chose to reject Arledge's alibi defense.

Arledge now insists on a new trial. He contends the affidavit of George Blakeman, which accompanied his motion for a new trial, also supports his contention that he did not commit the crimes for which he has been charged. Arledge asserts the affidavit shows that he met Blakeman at a Maverick Station in Boise on the afternoon of the incident. Arledge argues that this affidavit independently corroborates his testimony that he was not with Bell when the altercation took place.

█ The decision whether to grant or deny a motion for a new trial is discretionary, and unless that discretion has been abused, it will not be disturbed on appeal. *State v. Ames*, 112 Idaho 144, 730 P.2d 1064 (Ct.App.1986). In exercising this discretion, the district judge is guided by a four-step test adopted in *State v. Drapeau*, 97 Idaho 685, 551 P.2d 972 (1976). *Drapeau* requires:

(1) that the evidence is newly discovered and was unknown to the defendant at the time of trial; (2) that the evidence is material, not merely cumulative or impeaching; (3) that it will probably produce an acquittal; and (4) that failure to learn of the evidence was due to no lack of diligence on the part of the defendant.

*Id.* at 691, 551 P.2d at 978, *quoting* 2 C. WRIGHT, FEDERAL PRACTICE AND PROCEDURE: CRIMINAL § 557 at 515 (1969). If the newly-discovered evidence does not satisfy each of the requirements set forth in *Drapeau*, the district judge should not grant the motion for a new trial. *State v. Caldwell*, 112 Idaho 748, 735 P.2d 1059 (Ct.App.1987).

█ In this particular case, we need not examine each of the four requirements adopted in *Drapeau*, because the affidavit upon which Arledge relies is woefully inadequate. Blakeman's affidavit does not mention a time or date; and it does not even establish that Arledge was the man whom Blakeman met that afternoon. Pre-

590

sumably, in a retrial, Arledge would supply these missing details. The affidavit merely shows that on an afternoon in the spring of 1989, George Blakeman gave an unidentified man a couple of dollars to put gas in his pickup. In sum, Blakeman's affidavit is too vague to provide any support for Arledge's alibi defense. Accordingly, we hold that it was not an abuse of discretion for the district judge to deny the motion for a new trial.

## IV

Finally, Arledge contends that his sentences are unreasonable. For aggravated assault, Arledge received a unified sentence of twenty years, consisting of ten years' fixed plus an indeterminate ten years. I.C. §§ 18–901, –905, –906; 19–2513. On the second degree kidnapping charge, Arledge received a unified sentence of twenty-five years, ten years of which are fixed and fifteen years are indeterminate. I.C. §§ 18–4501, –4503, –4504; 19–2513. Arledge also received six months for the battery charge. I.C. §§ 18–903, –904. All of these sentences were to run concurrently. The sentences for aggravated assault and second degree kidnapping were subject to enhancement because Arledge was convicted of using a firearm in the commission of these crimes. I.C. § 19–2520.

In reviewing Arledge's sentence, we defer to the discretionary authority vested in the trial court. If a sentence is within the statutory limits, it will not be disturbed on appeal absent an abuse of discretion. *State v. Ramsey*, 115 Idaho 717, 769 P.2d 594 (Ct.App.1989). When considering the reasonableness of a unified sentence, we treat the fixed portion as the probable length of confinement. *State v. Sanchez*, 115 Idaho 776, 769 P.2d 1148 (Ct. App.1989). Therefore, Arledge must show that, under any reasonable view of the facts, ten years' incarceration is unreasonable in light of the sentencing goals, which include: retribution, rehabilitation, deter-

rence and, most importantly, the protection of society. *State v. Toohill*, 103 Idaho 565, 650 P.2d 707 (Ct.App.1982).

Arledge contends that his sentences are excessive, because these were his first felony convictions involving violence. However, the presentence report shows that Arledge has an extensive criminal record. He has been convicted of many crimes including burglary, carrying a concealed weapon, theft, assault, and lewd conduct with a minor. More importantly, this was not Arledge's first violation involving a weapon. In June of 1983, Arledge was caught carrying a sawed-off shotgun. The district judge was troubled by the fact that previously Arledge had been arrested for a weapon charge and had seemingly not learned anything from his encounter with the law. The judge explained that deterrence is obviously a factor in this sort of crime, particularly when a firearm is involved. It is readily apparent that some of Arledge's previous crimes involved violence. In any event, this record demonstrates that Arledge continues to be drawn toward criminal behavior.

Arledge also argues the district judge ignored his potential for rehabilitation. However, the record suggests otherwise. The district judge specifically noted that Arledge had almost no prospects for rehabilitation. Furthermore, the district judge stated that Arledge refused to take responsibility for the crimes he had committed and that he had apparently shunned all requests to cooperate with the presentence investigator. Moreover, Arledge had violated probation in the past, and these latest offenses occurred only a day after his release from jail. Therefore, it was reasonable for the district judge to conclude that serious risk of harm to the public might result absent a lengthy period of incarceration.

Having reviewed the record in its entirety, we find no abuse of discretion. The sentences are within the statutory limits and are reasonable in light of the sentencing criteria articulated in *State v. Toohill*, *supra*.

The judgment of conviction and the sentences are affirmed.

WALTERS, C.J., and SILAK, J., concur.