859 P.2d 955

**STATE of Idaho, Plaintiff–Respondent,**

v.

**Steven HASSETT, Defendant–Appellant.**

**No. 19355.**

Court of Appeals of Idaho.

Sept. 2, 1993.

358

William J. Fitzgerald, Lewiston, argued, for appellant.

Larry EchoHawk, Atty. Gen., Michael A. Henderson, Deputy Atty. Gen., Boise, for respondent. Michael A. Henderson argued.

WALTERS, Chief Judge.

Steven L. Hassett, Jr., was tried before a jury and found guilty of felony injury to a child based on allegations that he had injured his month-old son. *See* I.C. § 18–1501(1). He was also found to be a persistent violator under I.C. § 19–2514, and received a unified sentence of twenty years with a ten-year minimum period of confinement. During trial, the court admitted into evidence under I.R.E. 404(b) the testimony from two men who had investigated Hassett years before for injuring his then four-month-old daughter. Hassett appeals, ar-

guing that the court erred when it admitted the testimony, and that his sentence is excessive. We affirm.

### Facts and Procedural History

The facts are as follows. Hassett's son, J.H., was born on November 7, 1989, to Hassett and his girlfriend Vickie Richardson. The child's pediatrician was Dr. John Rusche, who performed several routine examinations of J.H. before the incidents at issue in this case. His last general, external examination of the child was on November 21, 1989, and he found nothing abnormal.

On November 30, however, J.H. was rushed to the hospital by paramedics because he had reportedly stopped breathing after Hassett had fed him. According to Hassett, earlier that night he and Richardson had argued, and he had left their small rented house for a while. When he returned, he offered to feed the baby while Richardson rested in another room. Hassett testified that after feeding he placed the baby on his shoulder to burp it. For several minutes the child was very quiet and did not burp. Hassett then attempted to lay J.H. down so Hassett could go to the bathroom. According to Hassett, it was then that he noticed the child had turned blue and was not breathing. He called Richardson. She rushed into the room, looked at the baby, then ran next door to call an ambulance. In the meantime, Hassett reportedly put the child's chest to his and squeezed. When that did not start the child breathing, Hassett turned J.H. around and tried the same maneuver again. This too was unsuccessful, so Hassett reportedly "thumped" J.H.'s chest and performed mouth-to-mouth resuscitation, which started the child breathing again. There was no evidence presented to show how hard Hassett squeezed or thumped J.H.'s chest. Hassett testified that although he had been employed as a janitor at a fire station and had seen CPR demonstrated, he had not been trained in the procedure.

The paramedics arrived within minutes and took J.H. to the hospital, where he was admitted around midnight and examined by the attending physicians. The next morning, December 1, Dr. Rusche examined the child and talked to the parents. The x-ray performed the night before to examine the child's organs—not his bones—indicated that J.H. "showed a moderate gastro esophageal reflux," in other words, a moderate flow of stomach contents into the esophagus. Dr. Rusche testified that reflux can manifest itself as spitting up, significant vomiting, wheezing, or as apnea.[1] He also stated that although reflux is a common problem in infants, it is very unusual for reflux to cause apnea.

In an attempt to prevent further apneic episodes, however, a reflux board was prescribed so that J.H. would be held on an angled platform, head-up and in a prone position. Hassett and Richardson were instructed on how to use the board, which is placed on a flat surface such as a bed or a floor and which uses a blanket to hold the baby in place. J.H. was released into the care of his parents on December 2.

On December 5 he was re-admitted to the hospital. Hassett and Richardson had brought J.H. to Dr. Rusche, the attending physician, because the child's left leg was red and swollen and a bruise was visible on the ankle. Hassett told Dr. Rusche that the child had fallen from the reflux board the day before, and that Richardson had noticed the child's left ankle was bigger than the right. Hassett told Dr. Rusche that he had twisted the left leg to investigate and when doing so he heard a small "popping" sound. Hassett stated that after hearing the sound, he and Richardson sought advice from a friend named Norma Netz, and Hassett's mother, between ten and eleven a.m. Both women told Hassett to take J.H. to the hospital. Hassett and Richardson, however, returned home, bathed, and did not take the baby to the hospital until five p.m.

---

1. Apnea is defined as a "transient cessation of respiration," or asphyxia. Webster's New Collegiate Dictionary (1981).

Dr. Rusche ordered x-rays of the leg and the rest of the child's skeleton. The leg x-ray revealed an avulsion fracture of the left tibia just above the ankle, caused by a pulling or twisting action. The doctor testified that this type of injury is very rare in infants twenty-eight days old, and "almost invariably" is caused by child abuse. The doctor testified that there was probably a second avulsion fracture on the end of the tibia nearest to the knee, and that the condition of the fractures indicated they had occurred very recently and at least within the previous seven days.

At trial, Richardson testified that it was impossible for the baby to have fallen from the reflux board because he had been secured with a blanket and surrounded by pillows. Dr. Rusche testified that a fall from the reflux board could not produce the force necessary to break the child's leg. Richardson stated that after Hassett twisted the baby's leg, the swelling got worse and J.H. began crying "really bad."

Dr. Rusche's examination of the skeletal x-rays revealed numerous broken ribs on the right and left side of J.H.'s chest, on the back near the spine. Due to the healing evident in the x-rays, the fractures appeared to have occurred at three different times. Three rib fractures were described as acute, meaning they had happened less than seven days before the x-ray was taken. One rib fracture was described as being seven to twelve days old, and three more were described as more than fourteen days old.

Follow-up skeletal x-rays were performed on January 16, 1990. They showed healing "knobs" on ribs three, four, five, six, seven, eight, nine, and ten on the left side and on rib seven on the right side. They also revealed a healing fracture on the left tibia, and what Dr. Rusche describe as probable fractures of the right and left femurs. At trial, Dr. Rusche testified that rib fractures are difficult to detect on infants without x-rays and 80% are discovered accidentally. He stated that because an infant breathes primarily from the abdomen, broken ribs may not increase the child's outward signs of pain or "fussiness." Dr. Rusche testified that CPR procedures could not have caused the rib fractures because of their different ages and that in a healthy child such as J.H., the chest is very springy. He also stated he had never before had a patient with as many broken bones.

The doctor testified that both times J.H. was admitted into the hospital, including his stay from December 5 until December 11, the child never required a reflux board to aid breathing and that the probable cause of his apneic spell was injury. The doctor opined that J.H. had been abused multiple times, with a total of five distinct episodes of injury.

After seeing the first skeletal x-rays, Dr. Rusche contacted the police department, which began an investigation with the help of the Idaho Department of Health and Welfare. Sufficient evidence was found to charge Hassett and Richardson and bring them to trial. At trial, the evidence established that the people who baby-sat J.H. on several occasions did not notice any obvious injuries or abnormalities. Hassett and Richardson were shown to be the only persons present the two times J.H. required emergency medical attention. Both times J.H. was in Hassett's immediate care.

In an attempt to prove that Hassett had injured J.H., the prosecution presented the testimony of Mr. Dallas Hohnsbehn and Mr. Lonnie Grimm about a previous incident of child abuse involving Hassett. In February, 1982, Hohnsbehn was employed by child protective services in Clarkston, Washington, and Grimm was employed as a Clarkston police officer.

Hohnsbehn testified that in 1982 he investigated a complaint of child abuse lodged by Hassett's mother, who lived in Clarkston. The child was Hassett's four-month-old daughter who had been in Hassett's immediate care just before Hassett's mother noticed bruises on the child's buttocks, legs, and neck.

Hohnsbehn testified that when he examined the baby he found bruises caused by a human hand on the lower neck, upper shoulders and upper front of the right

thigh. Hohnsbehn reported his findings to Grimm, who began an investigation.

Grimm testified that in 1982 Hassett admitted that he had been awakened at about two a.m. by the baby's cries, that he then tried to feed and burp the baby. According to Grimm, Hassett stated that when the baby would not stop crying, he lost his temper, laid the baby faced down in his lap and spanked her while holding her head and neck in one hand, leaving scratches and bruises. Apparently, old bruises were also evident on the baby's thigh. Hassett told Grimm that he had spanked the baby previously.

On cross-examination, Hassett stated that he had bruised his daughter in 1982, but did not remember the incident clearly. He described Grimm's account as "somewhat accurate."

Hassett's first trial in January, 1991, resulted in a mistrial. The second trial, which began on January 18, 1991, resulted in verdicts of guilty being returned against Hassett for felony injury to a child, and against Richardson for misdemeanor injury to a child. The jury determined that Hassett had been convicted of three prior felonies, thus he was a persistent violator. The court imposed a ten-year fixed term of confinement, to be followed by an indeterminate period of ten years. Hassett appeals his conviction and sentence.

### Admission of Evidence under I.R.E. 404(b)

#### A. Relevance

■ The trial court admitted the testimony of Hohnsbehn and Grimm as an exception to I.R.E. 404(b). The rule states that "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith." I.R.E. 404(b). In other words, such evidence is not admissible to show criminal propensity or guilt of the crime charged. *State v. Needs,* 99 Idaho 883, 591 P.2d 130 (1979); *State v. Winkler,* 112 Idaho 917, 736 P.2d 1371 (Ct.App.1987). However, such evidence may be admissible to prove,

among other things, intent, or absence of accident or mistake. I.R.E. 404(b). Idaho courts have adopted a two-tiered test to determine whether evidence of other bad acts may be admitted. *State v. Moore,* 120 Idaho 743, 745, 819 P.2d 1143, 1145 (1991); *State v. Arledge,* 119 Idaho 584, 588, 808 P.2d 1329, 1333 (Ct.App.1991). First, the evidence must be relevant to a material issue concerning the crime charged. *Moore,* 120 Idaho at 745, 819 P.2d at 1145; *Arledge,* 119 Idaho at 588, 808 P.2d at 1333; I.R.E. 401, 402. Relevant evidence is defined as evidence which has any tendency to make the existence of a fact of consequence in an action more probable or less probable than the fact would be without the evidence. I.R.E. 401. Second, the probative value of the evidence must not be substantially outweighed by the danger of unfair prejudice. *Moore,* 120 Idaho at 745, 819 P.2d at 1145; *Arledge,* 119 Idaho at 588, 808 P.2d at 1333; I.R.E. 403. Whether evidence is relevant, probative, and therefore admissible are determinations left to the discretion of the trial court. *Moore,* 120 Idaho at 745, 819 P.2d at 1145; *State v. Guinn,* 114 Idaho 30, 39, 752 P.2d 632, 641 (Ct.App.1988).

■ When reviewing a lower court's exercise of discretion, we conduct a three part analysis. We ask whether the lower court: (1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of that discretion and consistently with any legal standards applicable to specific choices; and (3) reached its decision by an exercise of reason. *State v. Hedger,* 115 Idaho 598, 600, 768 P.2d 1331, 1333 (1989); *State v. Boman,* 123 Idaho 947, 950, 854 P.2d 290, 293 (Ct.App.1993).

■ First, we address Hassett's contention that evidence of his prior acts were not admissible under the intent, or absence of accident or mistake exceptions to I.R.E. 404(b) because he never claimed that the acts he performed on J.H. were accidental. He argues that he intended to twist the child's leg and squeeze his chest, but only for examination and resuscitation purposes. He also asserts that the evidence provided by Hohnsbehn and Grimm was inflammato-

ry and caused the jury to focus on him as a "bad man," instead of on whether there was sufficient evidence to find him guilty of injuring J.H.

We note, however, that Hassett also argues that if he injured the child's ribs when performing CPR, it was an accident. Further, he has asserted that the child may have been accidentally injured when falling off the reflux board, or the sofa, and being caught by the leg by Richardson. Both assertions were contradicted by Richardson, who testified that it was impossible for J.H. to fall from the reflux board and he never fell from the sofa; and by Dr. Rusche, who testified that falling from the reflux board could not produce the leg injuries suffered by J.H. Given the contradictory evidence and the variety of defenses asserted by Hassett, the issues of intent and absence of accident or mistake were directly at issue.

Hassett was charged with violating I.C. § 18–1501(1)[2] and willfully causing or permitting: J.H. to suffer; or inflicting upon him unjustifiable physical pain or mental suffering; or causing or permitting him to be placed in a situation endangering him or his health when in Hassett's care or custody. The question of Hassett's intent, expressed as "willful" action in the statute and in the prosecutor's charging document, make Hassett's intent material, and opens the door for introduction of the evidence of prior bad acts offered by Hohnsbehn and Grimm.

Even though relevant to a material issue, however, the trial court had to weigh the probative value of the evidence of prior bad acts against its tendency to create unfair prejudice. To this end, we observe that "the admissibility of evidence of other crimes, wrongs, or acts to establish intent and an absence of mistake or accident is well established, particularly in child abuse

cases." *United States v. Harris,* 661 F.2d 138, 142 (10th Cir.1981). Further, we agree that:

> when the crime is one of infanticide or child abuse, evidence of repeated incidents is especially relevant because it may be the only evidence to prove the crime. A child of [very young age] ... is a helpless, defenseless unit of human life. Such a child is too young, if he survives, to relate the facts concerning the attempt on his life, and too young, if he does not survive, to have exerted enough resistance that the marks of his cause of death will survive him. Absent the fortuitous presence of an eyewitness, infanticide or child abuse ... would largely go unpunished.

*Id., quoting United States v. Woods,* 484 F.2d 127 (4th Cir.1973), *cert. denied,* 415 U.S. 979, 94 S.Ct. 1566, 39 L.Ed.2d 875 (1974). More specifically, one commentator has observed that:

> The courts often admit uncharged misconduct in child abuse cases when the defendant claims that he or she accidentally injured the child. If the defendant claims that he accidentally touched a child's genital organs, evidence of the defendant's similar uncharged sexual misconduct is admissible to prove the defendant's lewd intent.
>
> If the defendant claims that she intended to merely discipline the child, evidence of uncharged misconduct may be admissible to establish the defendant's intent to injure the child. If the defendant claims that he accidentally bumped into or ran down the victim, evidence of the defendant's other assaults on the same or similar victims is admissible to show intent.

Edward J. Imwinkelried, Uncharged Misconduct Evidence § 5:10 (1993). Our Supreme Court has held that in a prosecution

---

**2.** I.C. § 18–1501(1) states:

Any person who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of such child

to be injured, or willfully causes or permits such child to be placed in such situation that its person or health is endangered, is punishable by imprisonment in the county jail not exceeding one (1) year, or in the state prison for not less than one (1) year nor more than ten (10) years.

for the voluntary manslaughter of the defendant's eighteen-month-old stepson, evidence that the defendant had struck other young stepchildren in his household was admissible. *State v. Sanchez*, 94 Idaho 125, 483 P.2d 173 (1971). *Sanchez* discussed the common law rule which was later articulated in I.R.E. 404(b). In that case, the Court held that the probative value of the evidence outweighed any unfair prejudice, because the evidence helped establish the defendant's attitude toward his stepchildren, including the deceased child. The Court relied on the exceptions allowing admission of evidence of other bad acts to show motive, intent, or absence of mistake or accident.

In *State v. Greensweig*, 102 Idaho 794, 798, 641 P.2d 340, 344 (Ct.App.1982), we affirmed the admission of evidence of acts which occurred after the wrongful act for which the defendant was charged. There, a subsequent act of child molestation was admitted to show that the defendant's intent when committing the charged act was not innocent. We stated:

> The state asserts that the evidence was necessary to show the intent of appellant. The underlying reason for this exception lies in the fact that a person may claim he was honestly mistaken or lacked the requisite intent if the act stands alone; however, the probabilities of an honest mistake diminish as the number of similar transactions ... increase.

*Id.* at 798, 641 P.2d at 344. In the instant case, we agree with the trial court that the evidence provided by Hohnsbehn and Grimm was logically relevant to the crime charged.

### B. Remoteness

Hassett implicitly argues, however, that even if the evidence was relevant, it described an event too old to be probative. He claims that the seven to nine-year interval between the incident with his daughter and those with J.H. increase the prejudicial effect of the former to the point that it should have been excluded.

Our Supreme Court has determined that evidence of other bad acts which have oc-curred over a broad span of time may be admissible. At one end of the spectrum, the Court held that evidence of prior acts of uncharged misconduct was not remote in time because all of the incidents happened within hours or days of the murders for which the defendant was charged. *State v. Pizzuto*, 119 Idaho 742, 810 P.2d 680 (1991), *overruled on other grounds, State v. Card*, 121 Idaho 425, 432, 825 P.2d 1081, 1088 (1991). At the other end, the Court held admissible testimony from the defendant's victims in prior prosecutions for rape and assault with intent to commit rape, even though the prosecutions and convictions occurred eight and ten years before the incident at issue. *State v. Martin*, 118 Idaho 334, 796 P.2d 1007 (1990). Moreover, in *Moore*, 120 Idaho 743, 819 P.2d 1143, the Court found no error in admitting into evidence information concerning continued uncharged sexual misconduct that had occurred four to sixteen years before the crimes charged. In *Martin* and *Moore*, the Court relied on the trial court's determination that the prior incidents were probative and stated that the remoteness of the prior bad act goes to the weight of the evidence rather than to its admissibility. *Moore*, 120 Idaho at 745, 819 P.2d at 1145; *Martin*, 118 Idaho at 341, 796 P.2d at 1014. As expressed in a statement made by the Ninth Circuit Court of Appeals but applicable to this case: "We have declined to adopt an inflexible rule regarding remoteness in the context of rule 404(b)". *U.S. v. Hadley*, 918 F.2d 848, 851 (9th Cir.1990), *cert. granted,* —— U.S. ——, 112 S.Ct. 1261, 117 L.Ed.2d 491, *cert. dismissed,* —— U.S. ——, 113 S.Ct. 486, 121 L.Ed.2d 324 (1992). Moreover, the Court in *Martin* implied that the defendant's lack of access to children over the years may affect the probative value of relatively isolated prior bad acts:

> The remoteness in time—ten years—is not significant in this case in light of the fact that the defendant spent the intervening time in prison. Although the prior crimes evidence *was* prejudicial to the defendant (as is all evidence against the accused in criminal actions), the trial court did not err in finding the probative

value of the evidence outweighed its prejudicial effect. (Emphasis in original). *Martin*, 118 Idaho at 341, 796 P.2d at 1014, *quoting State v. Breazeale*, 238 Kan. 714, 714 P.2d 1356, 1363 (1986), *cert. denied*, 479 U.S. 846, 107 S.Ct. 164, 93 L.Ed.2d 102 (1986).

We note that the seven to nine-year interval of which Hassett complains found him in prison for several years because of separate felony convictions. Although the record describes the sentences imposed, it does not indicate exactly how long he was confined. It is clear, however, that his opportunity to associate with very young children was greatly diminished by his incarceration.

### C. Isolation and Similarity

Next, we address Hassett's implicit arguments that the prior incident was not sufficiently repetitious or similar to the instant case to be probative. Although repeated complex incidents are more likely to be probative than repeated simple incidents, in some cases a single similar instance of conduct can be material to increase the likelihood of mens rea. *Imwinkelried* § 5:06. One of the primary factors in this analysis is the similarity between the two events. The focus is on whether the prior bad act is "logically relevant" and increases the likelihood that the defendant acted intentionally in the recent event. *Id.*

Here, the trial court determined that the incident to which Hohnsbehn and Grimm testified was sufficiently similar to the occurrence in the present case to bolster the former's probative value. We agree. Both of Hassett's victims were his children. Both were infants—one was four months old, the other less than one month old. Both were in Hassett's sole care when injured. Both incidents involved feeding the children and then something "going wrong." In the first incident, Hassett's daughter would not burp after feeding, but kept crying. Hassett lost his temper and performed an admittedly injurious disciplinary act. While spanking the infant on his lap, he held it by the neck and shoulders and left scratches and bruises. He also left bruises on the child's legs. In the second incident, J.H. would not burp after being fed and somehow stopped breathing, a condition Hassett said he did not notice until he attempted to lay the child down. Both incidents resulted in physical injury to the children and investigations for child abuse, although the latter incident did not prompt suspicion until combined with information gathered several days later.

It is important to note that, after considering this information and determining that the evidence was probative, the trial court took steps to limit the prejudice which might arise from admitting it. The court held a hearing outside the jury's presence. It ordered an offer of proof before admitting the evidence. After the offer, the court restricted the information Hohnsbehn and Grimm could present. Then the court instructed the jury, orally and in writing, that the testimony could only be used for the limited purpose of establishing intent and absence of mistake or accident.

The court's comments demonstrate a clear recognition that the decision to admit the evidence was a matter for the court's discretion. When discussing the evidence at the hearing with counsel, the court cited rule 404(b) and relevant case law. The court acted within the outer boundaries of that discretion and consistently with the appropriate legal standards. It is also clear that the court took great pains to entertain arguments for and against the admission of the evidence and reached its decision by an exercise of reason. For these reasons, we conclude that the court did not abuse its discretion.

### Sentence

Hassett claims that his sentence of ten years mandatory confinement, followed by an indeterminate ten-year period, is excessive.

Idaho Code § 18-1501(1) carries as punishment a term of incarceration for one to ten years. Hassett was also determined by the jury to be a persistent violator under I.C. § 19-2514. Once this determination was made, Hassett's sentence could be en-

hanced by five years and up to life in prison. I.C. § 19–2514; *State v. Haggard*, 119 Idaho 664, 809 P.2d 525 (Ct.App.1991). Hassett's sentence is within the maximum described by these two statutes and thus is not illegal.

 Because his sentence is not illegal, to prevail on appeal Hassett must show that the court clearly abused its discretion when imposing the sentence. *State v. Brown*, 121 Idaho 385, 825 P.2d 482 (1992). A sentence may represent a clear abuse of discretion if it is shown to be unreasonable upon the facts of the case. *State v. Nice*, 103 Idaho 89, 645 P.2d 323 (1982). A sentence of confinement is reasonable if it appears at the time that confinement is necessary to accomplish the primary objective of protecting society and to achieve any or all of the related goals of deterrence, rehabilitation or retribution. *State v. Toohill*, 103 Idaho 565, 650 P.2d 707 (Ct.App.1982).

 In reviewing a sentence imposed under the Unified Sentencing Act, we treat the minimum period specified by the sentencing judge as the probable duration of confinement. I.C. § 19–2513; *State v. Sanchez*, 115 Idaho 776, 769 P.2d 1148 (Ct.App.1989). Thus, we view Hassett's actual term of confinement as ten years. He must establish that under any reasonable view of the facts a period of confinement of ten years was a clear abuse of discretion. We will not substitute our view for that of the sentencing court when reasonable minds might differ. *State v. Toohill*, 103 Idaho 565, 650 P.2d 707 (Ct.App.1982). However, we do conduct an independent examination of the record and focus on the nature of the offense, the character of the offender, and the protection of the public interest. *State v. Reinke*, 103 Idaho 771, 653 P.2d 1183 (Ct.App.1982); *State v. Shideler*, 103 Idaho 593, 651 P.2d 527 (1982).

 At the time of sentencing, Hassett was twenty-nine years old. His criminal record began in 1975 when he was thirteen and was charged with petit larceny. In 1977 he was placed on juvenile probation for sexually assaulting a five-year-old girl.

From 1975 to 1989, he had thirty-four recorded encounters with the legal system. His offenses fall into three categories: traffic offenses, burglaries and thefts, and assaults. Three of the burglaries resulted in felony convictions in 1981, 1982, and 1985. In each case he was sentenced to a term of incarceration, although his sentences were shortened by parole and commutation. The presentence report states that he was found guilty of child abuse in regard to the spanking incident of his infant daughter in 1982. For that crime he received a deferred sentence and three years' probation. The same year he received one of his felony burglary convictions, and a term in the penitentiary. He has been placed on parole several times, which he has violated.

The presentence report indicates that Hassett has a history of alcohol and drug abuse. Richardson stated that Hassett has a "hair-trigger temper" and was jealous of the time she spent with J.H. A psychological report from 1982 described Hassett's temper as "explosive," possibly due to a low I.Q. and brain injuries caused by physical abuse and the use of drugs and alcohol. The report stated that Hassett's chances for improvement were minimal due to the possible organic nature of his problems.

The record establishes that the court considered all of the appropriate sentencing objectives in light of the facts of the case and Hassett's criminal history. The judge observed that a sentence should not be imposed out of anger or indignation, but after a careful evaluation of the circumstances of a case and the objectives of sentencing. The court also recognized that "a person should not be incarcerated any longer than is necessary and correct after considering all of the objectives, . . . ." The court considered the aggravating and mitigating factors which had been presented and concluded that Hassett's crime was severe, was not an isolated event, and required a lengthy sentence, primarily to protect society.

Based on the record before us, we cannot say that the court's observations were erroneous, or that the sentence imposed is un-

reasonable. Although Hassett may disagree with the sentence, he has failed to establish that the court abused its discretion.

### Conclusion

Based on the foregoing, we conclude that the testimony regarding Hassett's prior incident of child abuse was properly offered, balanced, and admitted into evidence as an exception to I.R.E. 404(b). His sentence is not unreasonable given the circumstances of the case. Therefore, we find no abuse of discretion in the admission of the evidence or in the sentence imposed. The judgment of conviction and sentence are affirmed.

SWANSTROM and CAREY, JJ. Pro Tem., concur.