988 P.2d 1170

STATE of Idaho, Plaintiff–Respondent,

v.

James H. HAIRSTON, Defendant–Appellant.

James H. Hairston, Petitioner–Appellant,

v.

State of Idaho, Respondent.

Nos. 23414, 24225.

Supreme Court of Idaho,
Boise, February 1999 Term.

Aug. 24, 1999.

500

Randall D. Schulthies, Bannock County Public Defender; Thomas E. Eckert, Deputy Public Defender, Pocatello, for appellant in case no. 23414. Randall D. Schulthies argued.

Parmenter & Peterson, Bingham County Public Defender; Blackfoot, for appellant in case no. 24225. David N. Parmenter argued.

Hon. Alan G. Lance, Attorney General; Kenneth M. Robins, Deputy Attorney General, Boise, for respondent. Kenneth M. Robins argued.

WALTERS, Justice.

James H. Hairston appeals from a death sentence imposed for the murders of William and Dalma Fuhriman at their home on Marsh Valley Road near Downey, Idaho. He also appeals from the denial of his application for post-conviction relief. For the reasons stated below, we affirm the judgment of conviction and imposition of the death sentence. We also affirm the denial of Hairston's application for post-conviction relief.

### BACKGROUND AND PRIOR PROCEEDINGS

On January 6, 1996, Hairston and a companion, Richard Klipfel, were driving from Grand Junction, Colorado, to Spokane, Washington. They stopped at the Fuhrimans' ranch because they had run out of money and could not continue their journey. The Fuhrimans invited Hairston and Klipfel into

their home and offered to help them find jobs. While Mr. Fuhriman was sitting at a kitchen table looking at a phone book, Hairston shot him in the head and then shot Mrs. Fuhriman. Hairston and Klipfel took $30 in cash, credit cards, and some personal property from the Fuhrimans' home and continued their journey. Hairston and Klipfel pawned some of the Fuhrimans' property. They purchased several items with the credit cards including toy remote control cars, tires, food, gas, and lodging. They also attempted to purchase a Harley Davidson motorcycle and $2500 worth of snowboarding equipment, but the credit card was rejected. Hairston and Klipfel were apprehended together near Clarkston, Washington, three days after the murders.

A jury found Hairston guilty of two counts of first-degree murder and one count of robbery. The district court imposed a death sentence for each of the two murders and life in prison for the robbery. Hairston appealed. He also filed an application for post-conviction relief, which was denied. Hairston's direct appeal and his appeal from the denial of post-conviction relief have been consolidated for our review.

## ISSUES ON DIRECT APPEAL

1. Did the trial court commit prejudicial error by allowing evidence of Hairston's participation in an uncharged shooting in Colorado two days before the Fuhriman murders?

2. Did the trial court allow the state to go beyond the scope of direct examination when cross-examining Hairston?

3. Did the trial court err by allowing the jury to hear a belatedly disclosed taped conversation between Hairston and a defense witness who visited him in jail during the trial?

4. Did the trial court abuse its discretion by refusing to continue the trial?

5. Did the trial court deny Hairston a fair and impartial jury by refusing to excuse jurors for cause?

6. Does the accumulation of prosecutorial misconduct require a new trial?

7. Should this Court vacate the death sentence imposed, pursuant to Idaho Code § 19–2827?

8. Are two of the aggravating circumstances found by the trial court impermissible, requiring a resentencing?

## ANALYSIS

1. **The trial court did not err by allowing evidence of Hairston's participation in an uncharged shooting in Colorado two days before the Fuhriman murders.**

On rebuttal, the trial court allowed state witnesses to testify that Hairston shot a convenience store clerk in Grand Junction, Colorado, two days before the Fuhriman murders. The witnesses—including the victim—testified that Hairston and a juvenile entered the store while Klipfel waited outside in the car. Hairston shot the clerk in the head and then took money from the cash register. Hairston has never been charged with this shooting, and he argues that the evidence is impermissible character evidence that should have been excluded under Idaho Rule of Evidence 404(b).

Under Rule 404(b), evidence of uncharged misconduct is generally inadmissible when offered as evidence of the defendant's bad character. IRE 404(b); *State v. Moore,* 120 Idaho 743, 745, 819 P.2d 1143, 1145 (1991). However, such evidence may be admissible when introduced "for other purposes." IRE 404(b). Rule 404(b) lists several permissible purposes such as proof of motive, intent, plan, knowledge, and identity, but this is not an exclusive list. *State v. Arledge,* 119 Idaho 584, 588, 808 P.2d 1329, 1333 (Ct.App.1991). Evidence offered for the purpose of impeachment may be admissible, although not listed in 404(b). *Id.* To be admissible, the evidence must be relevant to show something other than the defendant's character and propensity to commit the crime charged; it must be relevant to a material and disputed issue. *Moore* at 745, 819 P.2d at 1145. Even if relevant and introduced for a permissible purpose, evidence of uncharged misconduct is subject to exclusion under IRE 403 if its probative value is substantially outweighed by the danger of unfair prejudice. *Id;* IRE 403.

■ The initial question of relevancy to a matter other than the defendant's character is a question of law over which this Court exercises free review. *State v. Raudebaugh,* 124 Idaho 758, 766, 864 P.2d 596, 604 (1993). Balancing of probative value against prejudice and the ultimate decision to admit or exclude the evidence is within the trial court's sound discretion. *State v. Porter,* 130 Idaho 772, 784, 948 P.2d 127, 139 (1997).

■ The trial court ruled three different times prior to trial on the admissibility of the Colorado evidence. On June 10, 1996, following a hearing, the court orally granted Hairston's *motion in limine* and held that the Colorado evidence was inadmissible. At that time, the court expressed its uncertainty as to why the state believed the evidence was relevant. After a submission of briefs, the trial court reversed itself. The court found that the Colorado evidence was necessary for the state to connect Hairston with the gun that was used in both the Colorado shooting and the Fuhriman murders, and thus to establish Hairston's identity as the one who shot the Fuhrimans. Based upon this necessity, the court found that the probative value of the evidence outweighed the danger of prejudice on the issue of identity. The court, however, found that the evidence could not be used to show motive because there was other evidence establishing robbery as the motive and its probative value for that purpose was consequently outweighed by potential prejudice. The court also found that neither intent nor a common plan were at issue in the charges against Hairston. On August 8, 1996, following a motion for reconsideration, the court reversed itself again and held that the Colorado evidence could not be mentioned at trial. This final pretrial ruling was based upon other evidence pointed to by Hairston that could be used to connect him with the gun. Based upon this other evidence, the court found that the Colorado evidence was no longer necessary to link Hairston to the gun. The court found once again that the potential prejudice from such dramatic evidence outweighed its probative value.

After the conclusion of the defense's case-in-chief, the trial court again considered the Colorado evidence. The court decided that Hairston's testimony at trial made the Colorado evidence more probative than prejudicial and reversed its earlier ruling. The trial court held that the Colorado evidence could be used on rebuttal for impeachment, and to show identification, intent, and motive. The trial court stated:

I think in this case it would go to motive, intent, and identity.

And, also, conflicting statements—well, I'll back up a little bit. And this Court, as the trial court, is using the two-tiered analysis and the Court believes the evidence is relevant to a material and disputed issue concerning the crime charged wherein the evidence the State desires to introduce would tend to establish motive, intent, and identification of the accused as a person who may have committed this crime.

This Court, as a trial court, is using my sound discretion. I believe the probative value of the evidence is now tipped. I believe the probative value of the evidence is not outweighed by the unfair prejudice to the defendant.

The defendant denied shooting the gun before January 6th. He said he didn't own the gun. He said that he was shocked when he saw the Fuhrimans shot because he's never seen anyone shot before, and he said he's never seen anyone shot before more than once. He also said that he's never pointed a gun at anyone before. And, also, there's a question of the ownership and/or possession of the gun when it was left in the car in Clarkston. There was a big issue made of that.

. . .

So, the Court is going to allow you to introduce this evidence based on that, impeachment and prior bad acts are the reasons the Court stated.

■ It appears that Hairston himself opened the door for the admission of the Colorado evidence. Hairston admitted that he was at the Fuhrimans' house on January 6 when they were shot. He testified, however, that Klipfel was the one who shot them. The defense in this case was premised upon Hairston as the follower, who was shocked when Klipfel shot the Fuhrimans and only remained with Klipfel after the murders because he was scared. Once Hairston testi-

fied that he had not fired the gun prior to January 6th, that he had never seen anyone shot before, and that he had never pointed a gun at anyone, the Colorado evidence became relevant to impeach his credibility. As the Court of Appeals stated in *State v. Arledge,* 119 Idaho 584, 588, 808 P.2d 1329, 1333 (Ct. App.1991), "whenever evidence is introduced for purposes of impeachment, it necessarily involves a witness' credibility, and credibility is always relevant."

█ Having satisfied the first requirement for the introduction of evidence under Rule 404(b)—relevance to an issue other than bad character—the sole remaining question is whether the probative value of the evidence is substantially outweighed by unfair prejudice. Since this is an issue within the discretion of the trial court, we review the district court's decision under a three-part test: (1) whether the trial court correctly perceived the issue as one of discretion; (2) whether the trial court acted within the boundaries of its discretion and consistently with the legal standards applicable to the specific choices available to it; and (3) whether the trial court reached its decision by an exercise of reason. *Sun Valley Shopping Ctr. v. Idaho Power,* 119 Idaho 87, 94, 803 P.2d 993, 1000 (1991). As the quoted language above clearly indicates, the district court recognized the discretionary nature of its inquiry, as well as the applicable legal standard.

█ We also find that the court made a reasoned decision within the boundaries of its discretion. In *State v. Rodgers,* 119 Idaho 1066, 1071, 812 P.2d 1227, 1232 (Ct.App. 1990), the Court of Appeals stated:

> Early in a trial, a judge may be cautious in assessing the relevancy and need of "other crimes" evidence. As the trial unfolds, certain evidence may become relevant for more than one purpose—here, for motive and impeachment. Such enhanced relevancy may tip the scales toward admissibility of the evidence and cause the probative value of the evidence to outweigh any unfair prejudice. That, we think, is what happened in this case.

That is what we believe happened in this case as well. The trial judge considered the Colorado evidence three separate times before the trial, and again during the trial; he made reasoned and thoughtful decisions each time based upon knowledge of the evidence as it became . available. The Colorado evidence certainly presented a risk of unfair prejudice, but given Hairston's testimony and the defense adopted at trial, the district court did not abuse its discretion by admitting this evidence.

**2. The trial court did not abuse its discretion by allowing the prosecution to cross-examine Hairston about his familiarity with the murder weapon.**

Hairston argues that the court improperly allowed the prosecution to go beyond the scope of direct examination when cross-examining Hairston. He argues that the prosecution was allowed to "bootstrap itself" into opening up the Colorado evidence by questioning Hairston about the gun even though he did not testify about the gun on direct examination. We disagree.

█ "Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness," but control of the scope of cross-examination is left to the discretion of the trial court. IRE 611(b); *State v. Jesser,* 95 Idaho 43, 49, 501 P.2d 727, 734 (1972). The trial court's discretion to allow cross-examination of criminal defendants about matters outside the subject matter of direct examination is limited by the privilege against self-incrimination. *Brown v. U.S.,* 356 U.S. 148, 78 S.Ct. 622, 2 L.Ed.2d 589 (1958). However, the privilege against self-incrimination is waived for all "matters raised" by the defendant's testimony during direct examination. *Jesser,* at 49, 501 P.2d at 734 (citing *Brown* ).

█ In its pretrial order excluding the Colorado evidence, the district court specifically stated that "the Court's ruling is of course contingent upon Hairston not placing at issue his possession of the gun prior to the shooting of the Fuhrimans. For example, if Hairston claims, at trial, that he found the gun after the Fuhrimans' death, then the State, on rebuttal, would be entitled to present this evidence to rebut Hairston's claims." Consequently, Hairston attempted to avoid mentioning his relationship with the gun pri-

or to the Fuhriman murders during direct examination. Despite his effort to avoid placing the Colorado evidence at issue, however, Hairston did testify on direct about the possession of the gun and tangentially its ownership. Hairston testified that Klipfel had the gun on January 6, when he said Klipfel shot the Fuhrimans. This also implies that Klipfel had possession of the gun at some time before he shot them. Hairston testified that he shot the gun at street signs after the Fuhriman murders. Hairston also testified, somewhat indirectly, that Klipfel owned the gun. When cross-examining Klipfel, Hairston's attorney emphasized Klipfel's testimony that when they entered the hotel in Clarkston, Hairston removed all of his possessions from the car, but that Klipfel left his possessions in the car. Hairston's attorney then emphasized that the gun was found in the car shortly thereafter. Continuing this theme, Hairston testified that he had removed from the car all of his property except a backpack and four blankets.

Based upon this testimony, we hold that the district court did not abuse its discretion by allowing the prosecution to cross-examine Hairston about his familiarity with the gun. Hairston knew before he testified that he risked opening the door for the Colorado evidence. He could not have reasonably expected to testify as he did without the prosecution inquiring into his own familiarity with the murder weapon. That he may have opened himself up to impeachment with the Colorado evidence, does not change the propriety of the cross-examination.

3. **The trial court did not err by allowing the jury to hear a belatedly disclosed taped conversation between Hairston and a defense witness who visited him in jail during the trial.**

On August 25, 1996, five days after the beginning of Hairston's trial, Bannock County jailers recorded a conversation between Hairston and a visitor, James Martin. Prosecutors became aware of the taped conversation on August 28, two days before Martin testified for the defense at Hairston's trial. Yet, the prosecutors waited until after cross-examining Martin to disclose the existence of the tape. Several days later, on September 4, the prosecution played the tape for the

jury to impeach Martin's credibility. Because the tape contains statements made by Hairston as well as Martin, and was not disclosed despite a continuing discovery request for all statements made by Hairston, Hairston argues that the tape should have been excluded. Hairston also argues that the tape was unfairly prejudicial and should have been excluded under IRE 403.

a. **Late Disclosure**

On March 15, 1996, Hairston filed a Rule 16 request for all statements made by Hairston and known to the prosecutors. Idaho Criminal Rule 16 provides:

> Statement of defendant. Upon written request of a defendant the prosecuting attorney shall permit the defendant to inspect and copy or photograph: any relevant written or recorded statements made by the defendant, or copies thereof, within the possession, custody or control of the state, the existence of which is known or is available to the prosecuting attorney by the exercise of due diligence. . . .

ICR 16(b). The prosecutor's duty to disclose statements covered by such a written request continues throughout the trial, and includes statements made after the original request is made. ICR 16(i).

The prosecution did not disclose the existence of the Martin tape for two days after learning of its existence, and then only after the cross-examination of Martin was completed. However, delayed disclosure of evidence is not necessarily reversible error. *State v. Pizzuto* 119 Idaho 742, 751, 810 P.2d 680, 689 (1991). The question is whether the delay so prejudiced the defendant's preparation or presentation of his defense that he was prevented from receiving a fair trial. *Id.*

The state argues that it did not intend to use the tape until after Martin testified. We do not agree that the state's duty to disclose evidence under ICR 16 is dependent upon whether the state intends to use the evidence, however, in this case we cannot say that Hairston's preparation or presentation of his defense was prejudiced because of the delay in disclosing the taped conversa-

tion. If Hairston's voice were not on the tape, the prosecution would have had no duty to disclose the tape to the defense, and the tape was not admitted as a statement made by Hairston. The tape was never admitted to impeach Hairston, nor as substantive evidence against him. The tape did not contain any new information that might have helped Hairston prepare his defense. Hairston was aware of everything on the tape because he was present during the conversation with Martin, and he knew that it might have been recorded. Essentially, Hairston is arguing that his preparation was prejudiced because Martin might have been better prepared to testify. However, the fact that Martin may have been better prepared and testified differently had he known of the existence of the tape, does not make Hairston's trial unfair.

### b. Unfair prejudice

■■■ Hairston also argues that the tape should not have been admitted because any probative value was outweighed by the potential for unfair prejudice. Trial judges have broad discretion in balancing the probative value of evidence against potential prejudice, and the decision to admit evidence will not be disturbed absent a clear showing of abuse. *Davidson v. Beco Corp.*, 114 Idaho 107, 753 P.2d 1253 (1987). We hold that the district court did not abuse its discretion in this case by allowing portions of the tape to be played for the jury.

■■■ Martin was called as a defense witness primarily to impeach the testimony of John Mullenix. Mullenix had testified that Hairston admitted killing the Fuhrimans during a conversation that took place while both Hairston and Mullenix were being arraigned for their respective crimes. Martin testified for the defense that he was arraigned the same day as both Hairston and Mullenix, that he observed both Hairston and Mullenix, and that Hairston and Mullenix were never close enough to one another to have had a conversation as Mullenix testified.

On cross-examination, Martin testified that he had not spoken with Hairston since the trial started, that he was not familiar with the name Richard Klipfel, and that he hadn't spoken with Hairston about what was going on at trial. The tape was recorded during a conversation that occurred five days after the trial began and appears to contradict these and other statements made by Martin during his testimony. The tape also indicates that during his testimony Martin may have downplayed his friendship with Hairston.

Hairston contends that the tape is prejudicial because he can be heard on the tape making comments about a female visiting another prisoner. Hairston made several comments such as "How's her ass look?" and "Hot damn, she's hot." Hairston also describes the clothes that he has been wearing at trial, and states that they make him look like "a homicidal maniac." Several other comments made by Hairston were redacted from the tape before it was played for the jury, but the foregoing statements were not removed.

The trial court considered both the probative value of the evidence and its potential for prejudice and concluded that the probative value of the evidence for impeaching Martin outweighed any potential for prejudice. The court also redacted parts of the tape pursuant to a stipulation between counsel. Although Hairston challenged the admissibility of the entire tape on the basis of potential prejudice, there is no indication in the record that Hairston ever asked the court to redact any portions of the tape beyond those that were taken out by stipulation. The trial court instructed the jury that the tape could only be used for the purpose of impeaching Martin. Under these circumstances we hold that the trial court did not abuse its discretion by admitting the tape for the sole purpose of impeaching Martin's testimony.[1]

### 4. The district court did not abuse its discretion by denying Hairston's motion to continue the trial.

On August 1, 1996, Hairston made a motion for a continuance in order to complete

---

1. While we do not believe that the tape was improperly admitted, we are troubled by the use of the tape once it was admitted. During closing, the prosecutor speculated about why Hairston never denied shooting the Fuhrimans during Martin's visit. This was clearly an improper use of the evidence, but does not affect the propriety of its admission. The prosecutor's comments are discussed hereafter under the topic of prosecutorial misconduct.

his scientific testing of the physical evidence. Although the evidence had been available to Hairston for some time, Hairston was awaiting the results of the state's tests to begin his own. The trial court had extended the deadline for the state to complete its testing by about thirty days on the, apparently erroneous, belief that Hairston had no objection to the extension. Hairston argues that he was entitled to a similar thirty-day continuance in order to complete his own testing before the trial.

The trial court orally denied Hairston's motion. The court stated:

> I guess it's maybe a tactical decision not to have something analyzed until after the State takes a crack at it to see what the result is. But there's still nothing to prevent the defendant from having this analyzed even while the State is doing their paperwork after they've analyzed it.

The district court then noted that part of the evidence had been available to the defense for some time, but was still in the sheriff's office waiting for someone to pick it up. The court continued:

> I'm going to deny the motion to continue at this time. And I certainly want your client to have the opportunity for a fair trial and I want you to call up the Utah people and see if they can put this testing you want done on a fast track and get you the results before the trial. If they won't do it, I want you to contact the court. The court doesn't want to get involved in this, Mr. Schulthies, but it appears to me that the lab would have plenty of time to do this and get you the results before the trial if they would just be willing to do it.
>
> At this time I'm going to deny your motion to continue and the trial will commence as scheduled on the 20th of August. Then I'm going to look at this again next week, next Monday, and you can advise the court how your lab work is going. Okay?

The transcript reflects further hearings on August 12, the next Monday, but there is no record that the motion to continue was discussed. There is no indication in the record that Hairston pursued the motion any further.

 The decision to grant a continuance is within the discretion of the trial court.

*State v. Hopple,* 83 Idaho 55, 357 P.2d 656 (1960). We hold that the court did not abuse its discretion with the "wait and see" approach taken on August 5.

5. **Hairston was not denied a fair and impartial jury because the court refused to excuse three jurors for cause.**

Hairston challenges the court's refusal to dismiss prospective jurors Reynolds, Bird, and Ruffridge for cause. Of the three, only Reynolds ultimately sat on the jury. However, Hairston argues that he was forced to use all of his preemptory challenges—some on potential jurors who should have been excused for cause—and that at least one biased venire person still remained. We conclude that the court did not abuse its discretion by refusing to dismiss Reynolds and Bird. We also note that Ruffridge was dismissed by the court for cause.

 The decision to excuse potential jurors is within the discretion of the trial court. *State v. Hedger,* 115 Idaho 598, 600, 768 P.2d 1331, 1333 (1989). The trial court does not need to find jurors that are entirely ignorant of the facts and issues involved in the case. *Murphy v. Florida,* 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975).

> To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Id.* at 800, 95 S.Ct. at 2036, 44 L.Ed.2d at 595 (quoting *Irvin v. Dowd,* 366 U.S. 717, 723, 81 S.Ct. 1639, 1642–43, 6 L.Ed.2d 751, 756 (1961)). Although not always dispositive, the court is entitled to rely on assurances from venire persons concerning partiality or bias. *See, State v. Jones,* 125 Idaho 477, 484, 873 P.2d 122, 129 (1994).

 While Reynolds acknowledged hearing television news reports about the case and hearing the sheriff discuss the case once at a neighborhood watch meeting, she made it clear through extensive questioning

that she would render a verdict based on the evidence at trial. Hairston's primary concern, that Reynolds possessed some vague knowledge of the Colorado evidence prior to trial, is undermined since the court ultimately allowed the actual evidence to be presented. Mr. Bird expressed some resentment toward attorneys in general and the criminal justice process as a whole, but he remained committed to the requirement that he judge the case on the basis of the evidence presented in court and the law as instructed by the court if he were selected as a juror.

The trial court did not abuse its discretion by refusing to dismiss these persons for cause.

## 6. Prosecutorial misconduct

Hairston raises several different instances of possible prosecutorial misconduct and argues that he is entitled to a new trial. According to Hairston, the prosecution obtained an extension of the discovery disclosure deadline without notifying the defense and without a hearing; hid the Martin tape for two days, represented that it was only to be used for impeachment, then argued during closing summation that Hairston never denied the murders on the tape; and referred to Hairston as a "murdering dog" during closing argument.

A conviction will be set aside for prosecutorial misconduct only when the conduct is sufficiently egregious as to result in fundamental error. *State v. Porter*, 130 Idaho 772, 785, 948 P.2d 127, 140 (1997). Prosecutorial misconduct during closing argument will be deemed fundamental error only if the comments were so egregious or inflammatory that any consequent prejudice could not have been remedied by a ruling from the trial court informing the jury that the comments should be disregarded. *State v. Smith*, 117 Idaho 891, 898, 792 P.2d 916, 923 (1990). Although we agree that the prosecution made improper arguments during its summation, we do not believe that the misconduct rose to the level of a fundamental error requiring a retrial.

The prosecution obtained a thirty-day extension of the deadline for completion of scientific testing. The extension was granted without a hearing and Hairston contends that he was never notified of the prosecution's request. The prosecution contends that the parties had agreed that the deadline would be extended if necessary. On the record before us, we can find no evidence that the prosecution obtained the extension by intentionally deceiving Hairston. The procedure was unusual, but we do not find sufficient evidence in the record to support a charge of prosecutorial misconduct.

The Martin tape was admitted solely for the purpose of impeaching Martin's testimony, and it would have been inadmissible if introduced for any other purpose. Despite the state's own arguments in support of admitting the tape, and the trial court's explicit order that the tape was admitted for the sole purpose of impeaching Martin, the prosecutor did not mention the tape during closing argument to discredit Martin. Rather, the prosecutor stated:

> The Martin tape that you listened to, the recording that the jail made on August 25th between James Martin and the defendant, James Hairston, is more telling maybe than a lot of other evidence in this case, because in that conversation what Mr. Hairston does not say is more crucial than what he does say.

> He calls Mr. Weber a snitch, some other names. He calls Mr. Klipfel a snitch and some other names. Not once does he tell Martin, ["]I don't understand what's happening here. Klipfel shot those people and I'm standing trial for their murder. These guys are setting me up. I'm being framed. I did nothing wrong except be at the scene and now they're going to court and they're testifying that I did things that I didn't do.["]

> He didn't say that. All he talked about was Weber the snitch, and Klipfel the snitch, and how something was probably going to happen to them for the testimony that they're providing against him.

The prosecutor also referred to Hairston as a "murdering dog." Hairston's attorney did not object to either of these statements.

The prosecutor's statements in this case, particularly with regard to the Martin tape, were clearly improper, and are condemned. As was noted in the concurring

opinion in *Luce v. State*, 642 So.2d 4 (Fla.Ct. App.1994), "[t]rial attorneys must avoid improper argument if the system is to work properly. If attorneys do not recognize improper argument, they should not be in a courtroom. If trial attorneys recognize improper argument and persist in its use, they should not be members of The ... Bar." Nevertheless, given the overwhelming evidence against Hairston in this case, we are not convinced that the verdict was affected by the prosecutor's improper conduct, and we do not find that the misconduct rose to the level of fundamental error.

### 7. Idaho Code § 19–2827 does not require alteration of Hairston's sentence.

Because Hairston received a sentence of death, this Court is required by statute to independently review Hairston's sentence to determine:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and

(2) Whether the evidence supports the judge's finding of a statutory aggravating circumstance from among those enumerated in section 19–2515, Idaho Code, and

(3) Whether the sentence of death is excessive.

I.C. § 19–2827(c). In addition to the requirement of independent review, this Court will address Hairston's arguments challenging the sentence of death imposed by the trial court.

Hairston argues that the death sentence was a result of the judge's passion or prejudice. I.C. § 19–2827(c). According to Hairston the prejudice is shown by the judge's rulings and comes from two sources: (1) Hairston is from Colorado, and the victims in Idaho were local people; and (2) the same judge accepted Klipfel's Rule 11 plea and therefore had pressure to accept Klipfel's account of the murders and to hold Hairston responsible for the murders. We find no support for either of these contentions.

▮▮ Judicial rulings, standing alone, do not constitute a valid basis for a claim of bias or partiality. *See, United States v. Grinnell Corp.,* 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *Liteky v. U.S.,* 510 U.S. 540, 555–56, 114 S.Ct. 1147, 1157–58, 127 L.Ed.2d 474, 490–92 (1994). Hairston points to the court's rulings which form the grounds for his appeal as support for his claim of bias. This Court has already upheld the trial court's exercise of discretion with regard to those motions challenged, and we find no basis for concluding that the trial court's decisions were made as a result of bias or prejudice.

Next, Hairston urges this Court to strike down Idaho's death penalty structure because it does not provide a meaningful guide for imposing the death penalty. *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). In particular, Hairston argues that the aggravating circumstances contained in I.C. § 19–2515 apply equally to all first degree murder defendants and do not, therefore, provide a meaningful way to distinguish between those who deserve capital punishment and those who do not. Hairston does not challenge any particular aggravating factor, instead he contends that in all first degree murder trials in Idaho the judge finds at least one aggravating factor. Thus, he argues, Idaho's statute must not provide meaningful direction for judges.

▮▮ While we doubt Hairston's underlying assumption, we find no legal basis for the review of all Idaho first degree murder cases that he suggests. Each aggravating circumstance must provide a principled basis for distinguishing between those who deserve the death penalty and those who do not. *Arave v. Creech,* 507 U.S. 463, 113 S.Ct. 1534, 123 L.Ed.2d 188 (1993). However, the Eighth and Fourteenth Amendments do not call for the elimination of all discretion in a judge's capital sentencing decisions. The court's discretion must be directed by " 'clear and objective standards' " to minimize the risk of wholly arbitrary and capricious action. *Lewis v. Jeffers,* 497 U.S. 764, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990). *See, e.g., Arave v. Creech,* 507 U.S. 463, 473–74, 113 S.Ct. 1534, 1541–42, 123 L.Ed.2d 188, 199–200 (1993). Hairston has not challenged a particular aggravating circumstance, and we do not find Idaho's death penalty scheme as a whole to be arbitrary and capricious.

Hairston argues that the death sentence imposed in this case is not proportionate and just. There is no legal basis for such a proportionality review. I.C. § 19–2827(c)(3) no longer requires a review of whether the death penalty in a case was "disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." The statute was amended (1994 Idaho Sess. Laws, ch.127), and the amendment jettisons the requirement of proportionality review. *See, State v. Fields*, 127 Idaho 904, 918, 908 P.2d 1211, 1225 (1995).

We find no merit in Hairston's arguments. Nor do we find any other basis after our own independent review under § 19–2827(c) for vacating Hairston's sentences.

**8. There is no need to resentence Hairston even if this court were to find the two challenged aggravating factors impermissible.**

Hairston challenges two of the aggravating factors found by the trial court and asks this Court to remand to the trial court for resentencing. However, because Hairston has not challenged two other aggravating factors found by the trial court we find it unnecessary to address the challenges he makes.

The trial court found that four aggravating factors had been proven beyond a reasonable doubt under the following statutory references:

1. Idaho Code Section 19–2515(h)(2)—at the time the murder was committed the defendant Hairston also committed another murder.

2. Idaho Code Section 19–2515(h)(6)—by the murder, or circumstances surrounding its commission the defendant exhibited utter disregard for human life.

3. Idaho code Section 19–2515(h)(7)—the murder was committed in the perpetration of or attempt to perpetrate robbery and burglary and the defendant killed, intended the killing, or acted with reckless indifference to human life.

4. Idaho Code Section 19–2515(h)(8)—the defendant by prior conduct or conduct in the commission of the murder at hand exhibited a propensity to commit murder which will probably constitute a continuing threat to society.

Hairston has only challenged two of these four factors: number three, and number four. Relying upon *Beam v. Paskett*, 3 F.3d 1301 (9th Cir.1993) and *Clemons v. Mississippi*, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990), Hairston argues that if two of the factors are found impermissible the case should be remanded for resentencing.

Neither *Beam* nor *Clemons* supports a remand in this case even if this Court were to find one or both of the aggravating factors challenged by Hairston to be invalid. In *Beam*, the federal court noted that Idaho courts weigh the aggravating circumstances against the mitigating ones. The court continued

> [w]hen the death penalty has been imposed as a result of such a weighing process, the subsequent elimination as invalid of one of the aggravating factors alters the balance and, as a result, renders the state court's prior determination that death is the appropriate penalty unreliable. *See Clemons v. Mississippi*, 494 U.S. 738, 751, 110 S.Ct. 1441, 1449, 108 L.Ed.2d 725 (1990). Thus our determination that an aggravating factor relied on by the Idaho court was unconstitutional as applied would ordinarily require us to vacate the death sentence. In this case, however, the trial court also found that, as a result of Beam's poor chances for rehabilitation, "any one of the aggravating circumstances found by this Court to exist outweighs the mitigating circumstances."

*Beam* at 1311 (citations omitted). Because the court found that each of the aggravating circumstances was subject to the same constitutional objection, the court never actually reached the issue presented by Hairston's case.

 In this case, the trial court did not engage in a weighing process as contemplated by the rule from *Beam* and *Clemons*. Indeed, such an aggregate weighing process is not allowed under Idaho's death penalty statute. I.C. § 19–2515(c); *State v. Charboneau*, 116 Idaho 129, 153, 774 P.2d 299, 323 (1989). In Idaho, the trial court must weigh

each of the aggravating circumstances separately against all of the mitigating circumstances. *Id.* The trial court in this case stated "[p]ursuant to Idaho Law, this Court must now weigh *all* mitigating circumstances against *each* aggravating circumstance so found...." [Emphasis in original.] The district court then found that the mitigating circumstances did not outweigh any of the found aggravating circumstances. When such an analysis is followed, the invalidation of one or more of the aggravating circumstances has no effect on the validity of the sentence imposed; the court has already determined that any one of the aggravating circumstances standing alone outweighs all the mitigating circumstances, thus justifying the death sentence.

Hairston has not challenged the aggravating circumstance upon which the district court particularly focused. The court stated

In performing this most awesome judicial responsibility, this Court focuses on that aggravating circumstance which I consider the most aggravated, specifically, Idaho Code Section 19–2515(h)(2), that the Defendant committed two willful, deliberate, and premeditated first degree murders.... This Court has carefully, compassionately, and meticulously considered and weighed all mitigating circumstances against this one aggravated circumstance and concludes the most harsh penalty allowed by law must and shall be imposed in this matter. All of the mitigating circumstances listed above weigh as pebbles in comparison to a boulder with respect to the cold-blooded, calculated, premeditated murders of Duke and Dahlma [sic] Fuhriman.

Because Hairston has not challenged two of the four aggravating circumstances, either of which the district court found sufficient to impose the death penalty, there is no reason to analyze his challenges to the other two factors.

## POST–CONVICTION ISSUES

The following issues are raised with respect to the district court's order denying Hairston's application under I.C. § 19–2719 for post-conviction relief from his death sentence.

9. Was Hairston prejudiced because the counsel appointed to represent him during the proceedings to extradite him from Washington also represented Klipfel?

10. Whether Hairston's trial counsel was ineffective.

11. Whether the trial court's instruction on reasonable doubt was improper.

12. Whether the use of a Rule 11 jury instruction was prejudicial.

13. Whether the trial court erred in failing to appoint co-counsel in Hairston's post-conviction proceeding.

14. Whether the trial court improperly considered constitutionally protected factors when sentencing Hairston.

15. Whether the trial court abused its discretion by denying Hairston's request for a defense mitigation expert.

16. Whether Hairston was denied his right to confrontation because the trial court did not recuse itself after also accepting Klipfel's plea.

17. Whether the trial court failed to consider alternatives to the death penalty and failed to adequately consider all mitigation evidence.

18. Whether Idaho's method of county-financed prosecutions resulted in an arbitrary and capricious application of the death penalty.

## STANDARD OF REVIEW

 An application for post-conviction relief initiates a proceeding which is civil in nature. *State v. Bearshield,* 104 Idaho 676, 678, 662 P.2d 548, 550 (1983). To prevail in a post-conviction proceeding, the applicant must prove by a preponderance of the evidence the allegations upon which the request for post-conviction relief is based. *Follinus v. State,* 127 Idaho 897, 908 P.2d 590 (Ct.App. 1995). All rules and statutes applicable in civil cases are available to the parties in a post-conviction proceeding. I.C. § 19–4907(a).

 Our review of the district court's decision to grant or deny the application is limited. The evidence must be viewed most

favorably to the trial court's finding. *Reynolds v. State*, 126 Idaho 24, 28, 878 P.2d 198, 202 (Ct.App.1994). The court's findings of fact will not be set aside unless clearly erroneous. I.R.C.P. 52(a); *McCoy v. State*, 129 Idaho 70, 921 P.2d 1194 (1996). A denial of post-conviction relief supported by substantial and competent evidence will not be disturbed on appeal. *State v. Pizzuto*, 119 Idaho 742, 810 P.2d 680 (1991).

## ANALYSIS

**9. Hairston has not shown that his extradition counsel actively represented Klipfel's interests in derogation of Hairston's interests.**

Hairston and Klipfel were apprehended together near Clarkston, Washington. The same attorney was appointed to represent both during proceedings in Washington to extradite them for the Fuhriman murders. Hairston contends that his counsel had a conflict of interest, and that he was prejudiced by this joint representation. According to Hairston, his extradition counsel allowed Klipfel to speak with the police first although Hairston was willing and eager to speak with them about the charges against him. He argues that counsel never informed him that Klipfel was talking or that he could speak with police if he wanted. Consequently, he argues that Klipfel was able to get his version of the events to the police first, and that when Hairston eventually did talk, the police believed Klipfel's version and not Hairston's. He also argues that counsel did not provide him with a phone number or keep in sufficiently close contact with him. Both Hairston and Klipfel ultimately waived extradition.

 Joint representation of defendants is not per se ineffective assistance of counsel. *Giles v. State*, 125 Idaho 921, 923, 877 P.2d 365, 367 (1994), *cert. denied,* 513 U.S. 1130, 115 S.Ct. 942, 130 L.Ed.2d 886 (1995). The defendant must show an actual conflict of interest. *Id.* However, the general requirement to show actual prejudice is relaxed, and the defendant need only show that counsel "actively represented conflicting interests." *State v. Guzman,* 126 Idaho 368, 371, 883 P.2d 726, 729 (Ct.App.1994).

 The district court found that there was insufficient evidence that counsel was actively representing conflicting interests. The court noted that Hairston's extradition counsel did not testify during the post-conviction proceedings, and that there was no evidence that he was aware that Klipfel was talking to police. The court also found that although counsel did not provide Hairston with a phone number, arrangements could have been made to have counsel present if Hairston wanted to talk to the police.

The district court's decision is supported by substantial and competent evidence. The evidence was insufficient to show that extradition counsel was actively representing conflicting interests. In sum, we hold Hairston has not established that his Washington counsel's performance was ineffective.

**10. Ineffective assistance of trial counsel**

Hairston raises several allegations of ineffective assistance of counsel. We will address those for which he has provided argument and citations. *See, State v. Zichko,* 129 Idaho 259, 263, 923 P.2d 966, 970 (1996).

 To establish a claim of ineffective assistance of counsel, the defendant must show both deficient performance and resulting prejudice. *Gibson v. State,* 110 Idaho 631, 634, 718 P.2d 283, 286 (1986) (citing *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). Counsel's performance is measured by an objective standard of reasonableness. *Aragon v. State,* 114 Idaho 758, 760, 760 P.2d 1174, 1176 (1988). There is a "strong presumption that counsel's performance falls within the 'wide range of professional assistance.'" *Id.*

Hairston argues first that he was denied the effective assistance of counsel because neither of the attorneys assigned to represent him during his trial had any prior trial experience in capital cases. We are not persuaded that this claim entitles Hairston to any relief.

 Counsel was not ineffective solely because of inexperience in capital trials. The constitution does not establish a minimum level of experience for the appointment of counsel in a death penalty case. *See Paradis*

*v. State,* 110 Idaho 534, 544–45, 716 P.2d 1306, 1316–17 (1986). Hairston's lead attorney had significant trial experience including participation in at least three first degree murder cases. The death penalty was not imposed in those cases, but was a significant possibility.

■ Hairston next contends that he was provided ineffective assistance of counsel when his attorney failed to move to disqualify the trial judge after the judge accepted Klipfel's plea. Where the alleged deficiency is counsel's failure to file or pursue certain motions, a conclusion that the motion, if pursued, would not have been granted, is generally determinative of both prongs of the *Strickland* test. *Huck v. State,* 124 Idaho 155, 158, 857 P.2d 634, 636 (Ct.App.1993). As we have already indicated it was not improper for the court to continue presiding over Hairston's trial after accepting his codefendant, Klipfel's, plea. In the order denying Hairston's post-conviction application, the trial court stated:

> the Court finds that the new trial judge would certainly have subsequently learned of Klipfel's Rule 11 agreement, and the jury would have learned of the agreement at trial during Klipfel's direct examination. The new judge also would have had to instruct the jury regarding the Rule 11 plea agreement. This factual finding further leads this Court to conclude that it is very likely that this Court would not have granted such a motion.

We also find it difficult to believe that such a motion would have been granted. The district court accepted Klipfel's plea in the afternoon on the day before Hairston's trial was scheduled to begin. We find it unlikely that the trial court would have granted Hairston's motion one day before the trial began, particularly given the lack of evidence of any possible prejudice caused by the acceptance of Klipfel's plea. Furthermore, we have already held that it was not improper for the court to simultaneously preside over the proceedings against both Hairston and Klipfel.

Hairston argues that counsel should not have allowed Hairston's forensic psychiatrist to publish his report to the court and prosecution, rather than limiting his report, opinions and conclusions for defense purposes.

We find no evidence that the psychiatrist's report was ever published to the court and prosecutors. The report appears to have been accidently delivered to the court attached to Hairston's presentence report, however, it also appears that the district court took special steps to ensure that it was never read or considered in sentencing Hairston. *See,* n. 2, *infra.* We find no evidence that Hairston's counsel was deficient in this matter.

■ Hairston argues that his counsel opened the door for the Colorado evidence. According to Hairston, counsel "failed to object during on officer's reference to the gun in connection with Colorado, and other conduct which ultimately led to the introduction of the Colorado evidence." We find no merit in this argument.

The Colorado evidence was admitted because Hairston denied shooting the gun prior to the Fuhriman murders, denied ever pointing a gun at anyone before, and testified that he had never seen anyone shot before witnessing the Fuhriman murders. Hairston's counsel clearly anticipated the possibility that the prosecution would attempt to get Hairston to testify in some way that would make the Colorado evidence relevant. He took great pains during direct examination to avoid questioning Hairston about areas that might potentially bring questions about the gun within the scope of cross-examination. When the prosecution began to cross-examine Hairston about the gun, counsel immediately objected that the prosecution was going beyond the scope of direct examination. Counsel stated:

> Your Honor, I would object to this line of questioning as beyond the scope of direct examination. We, in direct examination, strenuously and intentionally stayed away from any reference to other use of the firearm, any comments about Colorado, or any reference whatsoever to the Colorado incident. The State has now gone beyond what we feel is the scope of the examination directly of Mr. Hairston and I'm concerned about them opening up Colorado and then saying, well, it's been opened up, we want to bring in these other things.

We did not talk about experience with handguns or anything else. The only testimony regarding the gun was that Mr. Klipfel pulled it out of his pocket and shot and Mr. Hairston's testimony that he had shot the gun at signs going between Weiser and Clarkston.

It appears that counsel made a tactical decision to allow Hairston to testify knowing the risk that it might open the door for the admission of the Colorado evidence. We believe that it was Hairston's testimony and not any failure to act by Hairston's counsel that resulted in the admission of the Colorado evidence. We will not second-guess the decision to allow Hairston to testify regarding his version of the Fuhriman murders. *See State v. Larkin,* 102 Idaho 231, 628 P.2d 1065 (1981).

 Finally, Hairston argues that his counsel was ineffective because he did not object when the prosecutor referred to Hairston as a "murdering dog" during closing arguments. Hairston's post-conviction counsel questioned his trial counsel regarding this incident during the post-conviction hearing.

Q. Just two or three questions on objections that you apparently did not make. Were you aware that during their closing statements, the—and I believe it was Mr. Hiedeman referred [sic] to Mr. Hairston as a murdering dog?

A. Yes.

Q. Did you not—what was the reason for not objecting at that point?

A. I didn't object because I felt like it was fundamental error, and it would have been preserved as an issue on appeal anyway because of its inflammatory nature.

Q. What was—was there any gesturing that went with that at the time or just a statement?

A. I don't recall 'cause I was taking notes of his, of his closing. So I wasn't actually looking at him at the time. In my notes, I remember making a note that it was inflammatory or it was objectionable or whatever. But I did not voice an objection on the record.'

The trial court found that the failure to object was a tactical decision that it would not second-guess. We also agree that counsel's decision was a strategic or tactical decision and will not disturb such a decision on appeal. *See, Larkin.*

 Hairston makes the additional argument that it was ineffective for counsel not to object to the prosecutor's statement because the standard of review for prosecutorial misconduct during closing argument is heightened when the defendant's counsel does not object. This argument merits some additional discussion. Where defense counsel does not object during closing, this Court will review the propriety of any comments made only if they constituted fundamental error. *State v. Smith,* 117 Idaho 891, 898, 792 P.2d 916, 923 (1990). Error is fundamental when "the comments were so egregious or inflammatory that any prejudice arising therefrom could not have been remedied by a ruling from the trial court informing the jury that the comments should be disregarded." *Id.* If trial counsel had objected to the prosecutor's comments during closing, the court would have given the jury an instruction to ignore the comments. However, this Court would still have to determine whether the prosecutor's statements were so egregious that the curative instruction from the judge was insufficient. Consequently, the only result of counsel's failure to object is that the jury was not specifically given an instruction at that time to disregard the prosecutor's comments. We have already held in this case that the prosecution's reference to Hairston as a "murdering dog," although improper, did not rise to the level of fundamental error even in the absence of an instruction that it should be disregarded. Therefore, we find that Hairston was not prejudiced by counsel's failure to object to the prosecutor's closing statements.

## 11. The reasonable doubt instruction given to the jury was not improper.

 The trial court used the following reasonable doubt instruction:

You are instructed, that a defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether the defendant's guilt is satisfactorily shown, the defendant is entitled to a verdict of not guilty. This presumption places upon the

State the burden of proving the defendant guilty beyond a reasonable doubt.

Reasonable doubt is defined as follows: It is not a mere possible doubt; because everything relating to human affairs and depending on moral evidence is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction to a moral certainty of the truth of the charge.

This is the California jury instruction that has been recognized by this Court as the reasonable doubt instruction to be given in all criminal cases. *State v. Cotton,* 100 Idaho 573, 576, 602 P.2d 71, 74 (1979).

Hairston argues that this instruction is unconstitutional under *Cage v. Louisiana,* 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). The United States Supreme Court found the reasonable doubt instruction given in *Cage* improper because it used the phrases "grave uncertainty" and "actual substantial doubt" in combination was the phrase "moral uncertainty." Hairston argues that the instruction given in this case is improper because it also contains the phrases "moral evidence," "to a moral certainty," and "abiding conviction." We disagree.

This argument was recently rejected by this Court in *State v. Sivak,* 127 Idaho 387, 901 P.2d 494 (1995), and by the United States Supreme Court in *Victor v. Nebraska,* 511 U.S. 1, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994). We find these cases to be controlling. The reasonable doubt instruction given in this case correctly defined reasonable doubt.

## 12. Rule 11 jury instruction

 Hairston's codefendant, Richard Klipfel testified for the prosecution pursuant to a Rule 11 plea agreement. The trial court gave the jury the following instruction regarding Rule 11 agreements:

The prosecuting attorney and the attorney for the defendant, with the consent and approval of the defendant, may engage in a contractual process whereby the parties may work out a mutually satisfactory disposition of the case. An agreement reached by the prosecuting attorney and the defendant is a binding contract between such parties. The process usually involves the defendant pleading guilty to a lesser offense or to only one or some of the charges assessed against the defendant. In return for the defendant's plea, the prosecuting attorney will do one or more of the following:

No. 1, move for a dismissal of other charges;

No. 2, make a recommendation for a lighter sentence, or not oppose the defendant's request for a particular sentence (which may be less than the maximum for the original offense charged);

No. 3, agree that a specific sentence is the appropriate disposition of the case; and/or

No. 4, agree to any other disposition of the case, such disposition generally being something less than the offense originally charged, and/or lighter punishment recommendations than those possible for the original charge.

A Rule 11 plea agreement is a binding contract between the prosecuting attorney and the defendant. Once a plea agreement has been reached, the Court, on the record, will require the disclosure of the agreement in open court or, for good cause, in chambers. If the Court accepts the plea agreement, the Court shall inform the defendant that it will implement the disposition provided for in the plea agreement.

If the Court rejects the plea agreement, the Court will inform the parties of this fact and will inform the defendant that the Court is not bound by the plea agreement. The Court will therefore, afford the defendant the opportunity to withdraw his or her plea and advise the defendant that if the defendant persists in the guilty plea, the disposition of the case may be less favorable to the defendant than that contemplated by the plea agreement.

If the defendant persists in the guilty plea, after the rejection of the agreement by the Court, the plea agreement remains a binding contractual agreement between the prosecuting attorney and the defen-

dant; however, the Court need not follow the agreement.

Hairston argues that this jury instruction was prejudicial because it conveyed to the jury that the court had accepted Klipfel's version of the Fuhriman murders. He contends that the instruction speaks to the court accepting or rejecting the plea agreement, tacitly implying an approval of the agreement and acceptance of those facts supporting the plea by the court. We disagree.

The district court instructed the jury that Klipfel was an accomplice and that "[t]here must be evidence, other than the testimony of an accomplice, that tends to connect the defendant with the commission of the crime." The court also instructed the jury that:

> No remarks I have made, questions I have asked, or actions I have taken during the course of the trial are to be considered as an expression of my opinion regarding the facts or verdict in this case. If anything I have said or done indicates such an opinion, you shall disregard it and form your own opinion. Your verdict must be based solely on the facts as you find them and the law as I have given it.

We hold that Hairston failed to demonstrate a reasonable likelihood that the jury interpreted the instruction as an acceptance of Klipfel's testimony.

### 13. The district court was not required to appoint co-counsel for Hairston's post-conviction proceeding.

Hairston argues that the district court improperly denied his motion to appoint co-counsel for his post-conviction proceeding. We disagree.

Rule 44.2 of the Idaho Criminal Rules provides that upon imposition of a death penalty, the district court shall immediately appoint at least one attorney, who shall be someone other than counsel who represented the defendant prior to sentencing, to represent the defendant for the purpose of seeking post-conviction remedies under I.C. § 19–2719(4). Although the district court is not prohibited from appointing two attorneys under the rule, the appointment of more than one attorney is not required, but is a discretionary decision. It is well established that when a defendant has been provided with an attorney at public expense, his request for additional counsel is committed to the district court's sound discretion. *State v. Pizzuto*, 119 Idaho 742, 775, 810 P.2d 680, 713 (1991). Hairston provides no sound argument in particular why his case for post-conviction relief required two attorneys. Absent a showing that the court below clearly abused its discretion, the district court's exercise of discretion by rejecting Hairston's request will not be disturbed.

### 14. The trial court did not improperly consider constitutionally protected behavior when sentencing Hairston.

Hairston contends that the trial court improperly considered constitutionally protected behavior during sentencing. *See, Beam v. Paskett*, 966 F.2d 1563 (9th Cir. 1992). Hairston argues that:

> [t]he trial court's consideration of matters reflecting the judge's moral judgment regarding relationships, tattooing, association with gangs, ingestion of drugs at a young age, possession and use of handguns and unadjudicated criminal activity, violated Appellant's rights to be free from cruel and unusual punishment, to associate, to the presumption of innocence, to a jury trial, and to the equal protection and due process of law.

In his order denying Hairston's application for post-conviction relief, the judge, who had also presided over Hairston's trial and sentencing for the Fuhriman murders, found that:

> A close review of the Court's decision to impose the death penalty reveals that nowhere in the decision did the Court list tattooing, association with gangs, ingestion of drugs at a young age, as aggravating circumstances. As for the Court's consideration of Hairston's use of handguns and the shooting of the store clerk in Colorado, which was unadjudicated criminal activity, the Court's consideration of Hairston's use of handguns pertained to a criminal use of handguns, which is not constitutionally protected behavior. Moreover, the Court referred to the shooting in Colorado in connection with Hairston's criminal use of handguns.

(Citation to transcript and record omitted). Hairston has provided no citations to the record indicating that the district court considered any of the factors that he argues were improper. Hairston's criminal use of handguns is not constitutionally protected behavior, and this Court has upheld the consideration of prior unconvicted crimes during sentencing. *State v. Dunlap*, 125 Idaho 530, 535–36, 873 P.2d 784, 789–90 (1993). Consequently, we find no merit in Hairston's arguments.

### 15. The court did not abuse its discretion by denying Hairston's request for a defense mitigation expert.

■ Hairston relies upon *Smith v. McCormick*, 914 F.2d 1153 (9th Cir.1990), for the proposition that the appointment of a mitigation specialist is constitutionally required. This reliance is misplaced. In *Smith*, the court addressed the defendant's right to consult with a psychiatrist for purposes of determining whether the defendant had a psychiatric condition that could be considered as a mitigating factor at sentencing. *Id.* at 1171–73. This issue is not presented in Hairston's case. At counsel's request, a psychiatrist was appointed to consult with defense counsel and to explore possible mitigation evidence for use at Hairston's sentencing.[2] The district court also appointed an investigator to assist with Hairston's defense both before and during the trial and sentencing. We do not believe that the district court abused its discretion or violated the United States or Idaho Constitutions by refusing to also appoint a "mitigation specialist."

2. Hairston also alleges that the district court improperly required the defense "to disclose their expert psychologist's opinions." There appears to be some question with regard to whether any such disclosure was required. The state argues in its brief that although there was some initial confusion as to whether the psychologist's report should be disclosed, the court ordered that the report be sealed. We can find nothing in the record to indicate whether the record was sealed, and Hairston has cited nothing in the record to indicate that the court ever required its disclosure. However, after considering Hairston's request for a mitigation specialist, the court stated:

### 16. Hairston was not prejudiced because the same judge accepted Klipfel's plea and also presided over Hairston's trial.

Hairston argues that he was denied his right to confront witnesses because the trial judge heard pretrial motions and the guilty plea of his codefendant Klipfel. He contends that substantial evidence against him was produced during those proceedings while he was not able to confront the witnesses. He also argues that hearing this evidence and accepting the plea also made the judge biased in favor of Klipfel's version of the murders. We disagree.

Hairston's counsel were present at most, if not all, proceedings involving Klipfel, and received copies of all court documents. Furthermore, Klipfel testified at Hairston's trial, and was subjected to extensive cross-examination. Consequently, we conclude that Hairston was not denied the right to confront witnesses.

■ The fact that a judge may have been exposed to, or even presided over, the separate trial of a codefendant does not constitute a reason to question the judge's impartiality. *Paradis v. Arave*, 20 F.3d 950, 958 (9th Cir. 1994). Judges " 'are necessarily exposed to [extrajudicial matters] in the course of ruling on the admission of evidence; and the judicial system could not function if judges ... had to withdraw from a case whenever they had presided in a ... separate trial in the same case.' " *Id.* (quoting *United States v. Cowden*, 545 F.2d 257, 265–66 (1st Cir.1976), *cert denied*, 430 U.S. 909, 97 S.Ct. 1181, 51 L.Ed.2d 585 (1977)). We see no reason for a different result where the proceedings

Also, I would like the record to reflect that the Court received a hand-delivered report from [Hairston's psychologist]. It wasn't in an envelope and the Court didn't read it, but I had a meeting with counsel in chambers Monday and gave the report to [Hairston's counsel], and the [prosecutor] was present and didn't read it either; is that correct [directed to Hairston's counsel].

Hairston's counsel agreed that the court's statement was correct. This appears to support the state's position that the report was sealed, but inadvertently delivered to the court. It also indicates that although it was delivered, neither the court nor the prosecution ever read the report.

against the co-defendant result in a plea agreement.

### 17. Consideration of alternatives to the death penalty, mitigation evidence, and proportionality review.

Hairston argues that the district court mentions no consideration of alternatives to the death penalty in its findings in considering the death penalty under I.C. § 19–2515, though counsel requested it. He contends that the failure to consider alternatives violated the Eighth and Fourteenth Amendments and comparable Idaho rights to have the death penalty reserved for those rare crimes and individuals which compel no other sentence. Hairston also argues that the court failed to consider several mitigating factors (*see Lashley v. Armontrout,* 957 F.2d 1495 (8th Cir.1992)), and that there was considerable additional mitigating evidence produced during the post-conviction hearing that the court did not have available during sentencing. Hairston specifically argues that the court did not consider Hairston's youth, lack of criminal history, intoxication and lingering doubt on whether he or Klipfel fired the shots. Finally, Hairston argues that the court failed to engage in a proportionality review. We conclude that the record does not support Hairston's claims.

The district court's sentencing memorandum demonstrates that the court considered alternative sentences, including lifetime confinement without possibility of parole. The court considered Hairston's capacity for rehabilitation, but ultimately rejected this as a viable option. The court specifically identified Hairston's age, criminal history, and successful probation and counseling as mitigating factors, but there was never any evidence presented that Hairston was intoxicated at the time of the murders. The court was not required to consider any doubt about who committed the murder; this question was decided by the jury, and need not be considered in the penalty determination phase. Furthermore, there is nothing to indicate that the judge harbored any lingering doubt.

The new mitigating factors allegedly produced during the post-conviction proceedings were not in fact new. They were contained in the presentence investigation report and many were incorporated as mitigating factors found by the court.

Proportionality review is not required by the trial court. The trial court is required to weigh the mitigating factors together against each aggravating factor to determine whether the death penalty is warranted. I.C. § 19–2515(c). There is no requirement that the trial court also consider the present case comparatively with other capital cases. Prior to 1994, this Court was required to perform a proportionality review as Hairston suggests, however, that was an appellate rather than a trial court function. *See,* 1994 Idaho Sess. Laws ch. 127.

### 18. Jensen study

Hairston argues that Idaho's death penalty scheme is arbitrary and capricious. He argues that because counties are forced to bear the additional cost of financing death penalty trials, the prosecutors in rich urban areas are more likely to seek the death penalty. Hairston relies upon a study done by Dr. Eric Jensen, a professor of sociology at the University of Idaho who specializes in criminology. Hairston acknowledges that there are many factors to consider, which are not taken into account by Dr. Jensen's study. However, he contends that it is clear that there is an apparent, real disparity between urban and non-urban counties in assessing the death penalty, and that the most probable reason for this disparity is finances.

Dr. Jensen's study purports to show that the imposition of the death penalty is higher in urban counties than in primarily rural, non-urban counties. Based upon the U.S. Bureau of Census definition of metropolitan area, Dr. Jensen categorized the counties of Ada, Bannock, Bonneville, Canyon, and Kootenai, as urban counties. The other 39 Idaho counties were categorized as non-urban. Jensen then collected the names of persons sentenced to death in Idaho since 1978 and looked at the proportion of arrests for murder in urban and non-urban counties that resulted in death sentences. He found that the likelihood of a person being sentenced to death in urban counties, based on arrests between 1978 through 1995, was 7.8 percent, and the likelihood of a person who was ar-

rested for murder receiving the death penalty in non-urban counties was 3.5 percent. Dr. Jensen concluded that a person arrested for murder in urban counties was 123% more likely to be sentenced to death than a person arrested for murder in non-urban counties. Dr. Jensen also concluded that a person convicted of murder in urban counties is 56% more likely to be sentenced to death than a person convicted of murder in non-urban counties.

Taken at face value, Dr. Jensen's study suggests that death penalties are more likely to be imposed in urban counties than in non-urban counties. It is clear that larger populated more urban counties also have more money. The problem is that the Jensen study is not complete, and does not contain sufficient data to conclude that finances or any other potentially impermissible factors account for the discrepancy between urban and non-urban counties. Doctor Jensen himself concluded:

> Well, it does appear that in Idaho there is a difference, a disparity in imposition of death sentences via or between what we've called urban and non-urban counties. That I think is fairly clear.
>
> *The reasons underlying that are far from being decided because the data is not collected or analyzed.* But it appears that financial resources available to the counties do play a role in that.

(Emphasis added.) At best, Dr. Jensen's study shows a statistical discrepancy between the imposition of the death penalty in urban versus non-urban counties. Standing alone, such a discrepancy does not implicate any constitutional concerns. The United States Supreme Court has observed:

> The Constitution is not offended by inconsistency in results based on the objective circumstances of the crime. Numerous legitimate factors may influence the outcome of a trial and a defendant's ultimate sentence, even though they may be irrelevant to his actual guilt. If sufficient evidence to link a suspect to a crime cannot be found, he will not be charged. The capability of the responsible law enforcement agency can vary widely. Also, the strength of the available evidence remains a variable throughout the criminal justice process and may influence a prosecutor's decision to offer a plea bargain or to go to trial. Witness availability, credibility, and memory also influence the results of prosecutions. Finally, sentencing in state courts is generally discretionary, so a defendant's ultimate sentence necessarily will vary according to the judgment of the sentencing authority. The foregoing factors necessarily exist in varying degrees throughout our criminal justice system.

*McCleskey v. Kemp,* 481 U.S. 279, 308, 107 S.Ct. 1756, 1775, 95 L.Ed.2d 262, 288 (1987). In order to show that the imposition of the death penalty in Idaho is arbitrary and capricious, there must be some empirical evidence connecting the discrepancy that appears to be shown by Dr. Jensen's study and one or more impermissible factors. We conclude that there is insufficient evidence to draw any conclusions in this case.

The district court determined that:

> Hairston has not shown by a preponderance of the evidence that the decision of whether a prosecutor will seek the death penalty in Idaho rests, in large part, on the finances of the particular county. At most, Jensen's study indicates a discrepancy between the application of the death penalty between urban and non-urban counties and that financial resources play a role in a prosecutor's decision as to whether to seek the death penalty. Jensen admitted that there was a lot that he still has to do before his study is complete. He also indicated to the Court that his study "is not done. But the *indications* are that there is a difference here due to economic issues." There simply is not enough factual data in the professor's "study" for this Court to conclude that economics is a cause of the alleged disparity between the application of the death penalty between urban and nonurban counties.

We do not believe that the district court's conclusion was clearly erroneous.

## CONCLUSION

The judgment of conviction and the death sentence imposed for the murders of William and Dalma Fuhriman are affirmed. The de-

nial of Hairston's application for post-conviction relief is also affirmed.

Chief Justice TROUT, Justices SILAK, SCHROEDER, and KIDWELL, concur.