992 P.2d 158

STATE of Idaho, Plaintiff–Respondent,

v.

Jeffrey R. STROUSE, Defendant–Appellant.

No. 24268.

Supreme Court of Idaho,
Lewiston, October 1999 Term.

Dec. 16, 1999.

Jeffrey S. Barkdull and Dan B. Johnson, Spokane, Washington, for appellant. Dan B. Johnson argued.

Hon. Alan G. Lance, Attorney General, Boise, for respondent. Kenneth K. Jorgensen argued.

SCHROEDER, Justice.

Jeffrey Strouse (Strouse) was convicted of aggravated battery. He appeals, claiming improper use of his post-*Miranda* silence, failure of the trial court to allow a continuance of the trial, ineffective assistance of counsel and failure to grant a new trial.

## I.

## BACKGROUND AND PRIOR PROCEEDINGS

In the early afternoon of September 9, 1995, Mike Gunderson (Gunderson) was seriously injured by a shotgun blast to his right buttocks when a sawed-off shotgun held by Strouse discharged. Strouse and Gunderson had been best friends for a period of about six years, until April of 1995, when Gunderson accused Strouse of misconduct. After this time, both Gunderson and Strouse made threats to injure the other.

Matt Coleman (Coleman) was the only eyewitness to the shooting. Coleman had been living on Strouse's property near Coeur d'Alene. Gunderson was on Strouse's property, visiting with Coleman on the morning of September 9, 1995. Strouse was also coming to visit Coleman when he spotted Gunderson's car on the property. Strouse claims that he feared for his life and loaded his double-barrel, sawed-off shotgun to protect himself. Strouse asked Coleman where Gunderson had gone. Coleman said that he had run off into the bushes. Strouse saw Gunderson hiding behind Coleman's truck, and Strouse pointed the shotgun at Gunderson. There is some conflict in the testimony about what words were exchanged between Gunderson and Strouse at that point. Both agree that Gunderson began to leave Strouse's property with Strouse following close behind him with the shotgun.

Strouse's shotgun discharged, striking Gunderson in the right buttocks. Gunderson fell to the ground. Strouse ran up to Gunderson and apologized. He told Gunderson that it was an accident, and Strouse helped Gunderson onto the back of Strouse's truck, intending to take him to the hospital. However, Coleman got his car, and Strouse helped Coleman transfer Gunderson to Coleman's car. Coleman drove Gunderson to the hospital.

Strouse contacted an attorney, Lonnie Sparks, who advised Strouse to turn himself in.[1] Sparks also advised Strouse not to speak to the police about the crime and that his silence could not be used against him. Strouse turned himself into the police the day after the shooting but did not speak to the police. He appeared before a magistrate on September 11, 1995, and was advised of his rights. Ken Brooks, a public defender, was appointed to represent Strouse. Brooks met with Strouse on three or four occasions for a total of 60 to 75 minutes. Strouse provided Brooks with a list of witnesses to contact, but claims that Brooks only contacted two of the requested witnesses. Strouse called his lawyer collect from jail, but all of his phone calls were refused. The lack of preparation worried Strouse, who sent his lawyer several letters and faxes from jail. Strouse moved for a continuance two days before trial on the basis that his attorney was not prepared, but the continuance was denied.

During the trial the prosecution questioned Strouse extensively about his post-*Miranda* silence. Defense counsel made no objection.

---

1. Lonnie Sparks later withdrew as Strouse's attorney after Matt Coleman offered to sell his testimony to Sparks.

The prosecution also used Strouse's silence in closing argument to imply that Strouse was guilty.

Strouse retained private counsel after the trial and sought a new trial under Idaho Code § 19–2406 and Idaho Criminal Rule 34. The trial court denied this motion. Strouse was sentenced to a fixed term of incarceration of two years with an indeterminate term of five years to follow.

## II.

### THE PROSECUTION'S USE OF STROUSE'S POST-*MIRANDA* SILENCE VIOLATED HIS FIFTH AMENDMENT RIGHTS TO REMAIN SILENT.

◼ Strouse argues that the prosecution made improper use of his post-*Miranda* silence during cross-examination and closing argument in violation of his Fifth Amendment right to remain silent.

The prosecutor conducted the following cross-examination:

Q  The next day you turned yourself in; is that correct?

A  At 1:30.

Q  The next day?

A  Yes.

Q  And the law enforcement officers asked to talk to you at that time; is that correct?

A  Yes, they did.

Q  And you refused?

A  Of course.

Q  And you never told this version, you never told this story to anyone at any time until you testified in another hearing on or about January—January 8, I believe; is that correct?

A  Yes.

Q  So, this happened on September 9th. On September 10th, you declined to talk to anybody; correct?

A  Correct.

Q  In the rest of September, all of October, all of November, all of December, and into January, you remained quiet?

A  Only to counsel.

Q  Oh. So, you spoke to counsel. You spoke to Mr. Brooks?

A  Yes.

Q  And you spoke to Lonnie Sparks, didn't you?

A  Yes.

Q  In fact, you had quite a few conversations with Lonnie Sparks initially after this happened?

A  I waited to get a hold of him before I turned myself in.

Q  You had several conversations with Lonnie Sparks before—or immediately after this happened, didn't you?

A  A few, yes.

Q  But you did not, did you, Mr. Strouse, tell law enforcement where the gun was or what you had done with the gun, did you?

A  No. I assumed they found it.

Q  And you never did?

A  No.

Q  And you never told law enforcement anything about what happened to the blanket?

A  They never asked, no.

Q  And you never told law enforcement about why you cleaned up the tailgate on your Blazer?

A  Nobody asked.

Q  And you never told law enforcement why you covered up the blood, did you?

A  I didn't talk to anybody.

Q  And immediately after this, you drove your Blazer up to Matthew Coleman's place and hid it over there, didn't you?

A  The Blazer?

Q  Yes.

A  No, that's not correct.

Q  Where did you hide the Blazer after this happened?

A  I just left it parked out in the open up on the top of the ridge, actually, about a half mile west of Matthew Coleman's trailer.

Q  Did you tell law enforcement where you had put it?

A No. They found it before I turned myself in anyway.

Q Now, you knew that law enforcement would be very interested in that gun, didn't you?

A Yeah, I assume so.

Q And you knew that law enforcement was looking for it, didn't you?

A Actually, they searched a friend of mine's house, and that's when I realized they were still looking for it.

Q Yes. They were issuing search warrants—or getting search warrants issued looking for that gun, weren't they?

A Yeah.

Q And still, you told them nothing?

A That's—

Q Is that correct?

A —how I was advised, yes.

Q And then you went and found it, but you didn't tell law enforcement you found it, did you?

A No.

Q And you took it to a gunsmith at some point?

A That day I found it.

Q You didn't tell law enforcement about that?

A No, I didn't.

Q Then you got it back from the gunsmith into your possession; is that correct?

A Yes.

Q You didn't tell law enforcement about that?

A No.

Q And you gave it to your attorney?

A Yes.

Q And your attorney had it for several weeks, and still you hadn't told law enforcement, had you?

A Then—then I was asked. I was asked on the 26th of December about it.

Q At this other hearing in January?

A No.

Q January 8th?

A No. It was December 26th. Sergeant Wiedenhoff asked me about it when I was picking up my Blazer.

Q Detective Wiedenhoff asked you about what?

A The gun.

Q Okay. Okay. Didn't—at that time, Mr. Strouse, isn't it a fact that you told Detective Wiedenhoff something to the effect of, "Huh. You guys haven't found that gun yet?"

A No.

Q You didn't say something like that?

A No.

Q Is it your testimony that you told Detective Wiedenhoff where the gun was?

A What's that again?

Q Is it your testimony that you told Detective Wiedenhoff where the gun was on December 26th?

A I told him he'd have to ask my attorney.

Q Oh. So, you refused again to talk to law enforcement?

A Normal procedure, yes.

Q Do you have any idea how that blanket got burned up in Matthew Coleman's firepit?

A You'd have to ask Mr. Coleman.

Q I'm asking you if you know.

A No, I don't.

Q You indicated that Mr. Gunderson had been threatening you repeatedly over the telephone?

A Yes.

Q But you didn't tell that to law enforcement either, did you?

A No, I didn't.

Q You indicated that you even had some of these conversations recorded; is that correct?

A That's correct.

Q You didn't provide those to law enforcement?

A No, I didn't.

The prosecutor made the following final argument:

Why did he hide the gun, if this was an accident? He says he tossed it in the

bush. Yeah, right. Even if he tossed it in the bush, he knew they were looking for it. He knew it could prove his innocence. Well, with all the other facts, it couldn't even do that. Why didn't he tell anybody? They were executing search warrants. They were looking for him. He turned himself in. Now, he jumps up here, and he's quick to tell you, "I'm innocent. I didn't do it. This was an accident."

If he was innocent, if this was an accident, why didn't he tell the cop that when he turned himself in? Doesn't make sense. Nothing he's told you makes sense. Not a thing that he has told you makes sense.

The State concedes that the prosecutor's statements in final argument were improper but maintains they were harmless. On the other hand, the State argues that the prosecutor's cross-examination was proper because Strouse's attorney opened the door in his opening statement and Strouse opened the door in his direct examination. Strouse's trial counsel made the following statement in his opening:

And then Jeff goes home. Jeff doesn't hide. Jeff waits to be contacted. The next day, Jeff still isn't contacted. He goes down, and he says, 'Look, are you guys looking for me? Let me tell you what happened.' Then he's arrested.

Strouse gave the following testimony concerning the whereabouts of a blanket used after Gunderson was shot:

Q What did you do with the blanket?

A I just—I think I just tossed it aside down there at the bottom landing.

Q Were you trying to conceal the blanket?

A No. I just put it on—I think it was underneath—it had blood on it, and I can't remember exactly where I put it. It was up there somewhere.

Q Did anyone ask you for this blanket?

A No.

Strouse gave the following testimony on direct concerning the shotgun:

Q Did you have the opportunity to go back to that scene and find the gun?

A I assumed that the police had found it. And they searched a friend of mine's house looking for it around the middle of November or so. And, yeah, I went back up there and looked for it, and found it myself.

Q Why did you go back up there looking for it?

A Because it was the—it was the best piece of evidence that I had to prove that it was an accident, you know. It was just an old—it was an old gun given to me, and I'd only fired it one time before that. It was just a—

Q Where did you find it at?

A I guess I threw it a little further than I thought. It was about fifteen, twenty feet off the road in the bushes right next to where the accident happened.

Q How did you happen to find it there?

A Actually, I'd gone up the day before looking for it, and I couldn't find it. I walked all over. I figured if he didn't have it—if the police didn't have it, and Mr. Coleman didn't get it, then it's got to be up there. So, I went and rented—I rented a metal detector at Sun Rental earlier that morning—the next morning. And then I walked right to it. I guess I'd walked over it a couple times before I got—before I found it with the metal detector.

Q Was it in some brush or something?

A It was—yeah. There's bush and trees around there. A lot of—

■ The general rule is that use of defendant's post-*Miranda* silence to impeach the defendant violates due process. *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). However, the State argues that the use of Clark's silence was proper, pursuant to the footnote 11 exception in *Doyle*:

It goes almost without saying that the fact of postarrest silence could be used by the prosecution to contradict a defendant who testifies to an exculpatory version of events and claims to have told the police the same version upon arrest. In that situation the fact of earlier silence would not be used to impeach the exculpatory story, but rather to challenge the defen-

dant's testimony as to his behavior following arrest.

*Doyle v. Ohio,* 426 U.S. at 619 n. 11, 96 S.Ct. at 2246 n. 11, 49 L.Ed.2d at 98 n. 11. The prosecution argues that the prosecutor's cross-examination falls within this exception and was proper to impeach Strouse's testimony. However, the facts of this case do not call the *Doyle* exception into play.

Clearly a defendant should not be allowed to mischaracterize the facts on direct examination, knowing the prosecutor is powerless to impeach. To a limited degree Strouse may have created a false impression by his testimony on direct with regard to the blanket when he was asked by his attorney if anyone asked him for the bloody blanket and he answered in the negative. Perhaps this created the impression that the police were not diligently investigating or that they were not interested in the blanket. However, any misleading impression which might have arisen could have been cured on cross-examination with limited questions regarding Strouse's silence about the blanket. The prosecutor's examination about Strouse's silence far exceeded the scope of anything he testified to on direct. Similarly, Strouse's testimony on direct concerning the gun was very limited. It did not open the door to the salvo delivered by the prosecutor.

The State also argues that the opening statement of Strouse's attorney created a false impression, and that this statement opened the door to impeachment on cross-examination. However, the State has presented no authority for the proposition that it is proper to rebut an opening statement through the use of a defendant's post-*Miranda* silence, nor has this Court discovered authority which supports this position. Strouse's attorney did not support the comment in the opening statement with evidence, and the trial court instructed the jury that the statements of counsel were not evidence. The prosecutor cannot justify the examination that took place on the limited statement of defense counsel in opening.

Taking the excessive cross-examination and the final argument of the prosecutor together, it is clear that the prosecution went far beyond use of the post-*Miranda* silence for any legitimate purpose. The prosecutor sought to establish guilt by Strouse's exercise of a constitutional right, a right he had been advised of by counsel and subsequently by a magistrate and district judge.

## III.

### THE CONSTITUTIONAL VIOLATION WAS NOT HARMLESS ERROR.

When inadmissible evidence has been introduced, the question is whether this Court is "convinced beyond a reasonable doubt that the same result would have been reached had the evidence been properly excluded?" *State v. LePage,* 102 Idaho 387, 396, 630 P.2d 674, 683 (1981). This case hinged on credibility. There was evidence to support the jury's determination of guilt. There was bad blood between Strouse and Gunderson. There was expert testimony that the shotgun could not discharge accidently and some legitimate impeachment of Strouse in cross-examination. On the other hand, there was evidence supporting Strouse's claim that the shooting was accidental. He immediately apologized and offered assistance. The only other eyewitness had attempted to sell his testimony to the defense—which was rejected. There was some evidence the shotgun could discharge accidently. Ultimately, the case turned on whether the jury believed Strouse when he said the shooting was an accident. The cross-examination and final argument undercut Strouse's credibility for exercising a constitutional right his attorney and two judges told him he had and which could not be used against him.

## IV.

### CONCLUSION

The judgment of conviction is vacated and the case is remanded for new trial. In view of the Court's conclusion, it is unnecessary to decide other issues raised.

Chief Justice TROUT and Justices SILAK, WALTERS, and KIDWELL, concur.