**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 38785**

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | 2012 Unpublished Opinion No. 718 |
| | ) | |
| Plaintiff-Respondent, | ) | Filed: November 14, 2012 |
| | ) | |
| v. | ) | Stephen W. Kenyon, Clerk |
| | ) | |
| JACK FRANSISCO GALLEGOS, | ) | THIS IS AN UNPUBLISHED |
| | ) | OPINION AND SHALL NOT |
| Defendant-Appellant. | ) | BE CITED AS AUTHORITY |
| | ) | |

Appeal from the District Court of the Fourth Judicial District, State of Idaho, Ada County. Hon. Patrick H. Owen, District Judge.

Judgment of conviction for possession of a controlled substance with the intent to deliver and being a persistent violator, affirmed.

Sara B. Thomas, State Appellate Public Defender; Diane M. Walker, Deputy Appellate Public Defender, Boise, for appellant.

Hon. Lawrence G. Wasden, Attorney General; Nicole L. Schafer, Deputy Attorney General, Boise, for respondent.

_____

GUTIERREZ, Judge

Jack Fransisco Gallegos appeals from his judgment of conviction entered upon jury verdicts finding him guilty of possession of a controlled substance with the intent to deliver and being a persistent violator. For the reasons set forth below, we affirm.

**I.**

**FACTS AND PROCEDURE**

While driving a borrowed vehicle, Gallegos was stopped by an officer for speeding. The officer arrested Gallegos based on information received from dispatch. When conducting a pat-down of Gallegos, a second officer noticed Gallegos's shirt and pants were wet. Gallegos explained he had just spilled coffee on himself, an explanation that was consistent with the officer's observation that the wet spot was "very damp and also warm, as if the coffee had been fresh." The officer discovered a digital scale with white residue in Gallegos's pocket. A subsequent search of the vehicle yielded a baggie of marijuana found hidden near the stick shift.

1

Gallegos admitted the marijuana was his and stated he used the scales to weigh it. The officer also found an "extremely warm," almost full McDonald's cup of coffee in the driver's side cup holder, the only cup the officer found in the vehicle. Inside the cup was a glass pipe wrapped in electrical tape, which the officer testified was consistent with those used to smoke methamphetamine, and nine small baggies containing methamphetamine. Later, a note card was found in Gallegos's wallet, which appeared to be a drug ledger listing then-current methamphetamine prices.

Gallegos was charged with possession of a controlled substance with the intent to deliver (methamphetamine), Idaho Code § 37-2732(a); possession of a controlled substance (marijuana), I.C. § 37-2732(c); possession of drug paraphernalia, I.C. § 37-2734A; and being a persistent violator, I.C. § 19-2514. At trial, the following exchange occurred between the prosecutor and Detective Holtry, who interviewed Gallegos once he was brought to the station:

| [Prosecutor]: | And after you got through the initial just kind of where he was, did you start to investigate the substances found in his car? |
|---|---|
| [Detective Holtry]: | I did. I asked him about the marijuana that was found. He said that it was his. I then asked him [about the digital scales] located at his pocket after he was arrested on the scene. |
| | He said he had borrowed those scales from a friend to weigh the marijuana that was found in the vehicle. |
| | I asked him why there was a white powdery residue on them, and he said he didn't know because he had borrowed them. I asked him about the baggies with the white crystals. And I believe at that point, *he became defensive and said he didn't want to talk about that and asked for an attorney.* |
| [Prosecutor]: | Stop you right there. |
| [Detective Holtry]: | Uh-huh. |
| [Prosecutor]: | So after not wanting to talk about the methamphetamine, did--was the interview ended? |
| [Detective Holtry]: | Yes. |
| [Prosecutor]: | Okay. So he didn't want to talk about methamphetamine? |
| [Detective Holtry]: | No. |

(Emphasis added).

Following several more questions, the prosecutor asked Detective Holtry his opinion of Gallegos's intent regarding the methamphetamine:

2

| [Prosecutor]: | And so taking everything into account, based on your training and experience *and the interview* and all the evidence you had before you, what did you think the defendant was going to do with the methamphetamine that he had? |
|---|---|
| [Detective Holtry]: | He was going to sell it. |

(Emphasis added). During closing arguments, the prosecutor mentioned that Gallegos refused to discuss the methamphetamine with Detective Holtry and reminded the jury that "when asked about it, he got defensive, and the interview was ended."

The jury found Gallegos guilty as charged. Gallegos now appeals his convictions for possession of a controlled substance with the intent to deliver and being a persistent violator.

## II.

## ANALYSIS

Gallegos contends his constitutional rights to a fair trial, due process, and to remain silent were violated by the prosecutor's elicitation of testimony as to Gallegos's silence and the prosecutor's comment on the silence during closing arguments. He concedes the alleged errors were not objected to at trial, but argues they amount to fundamental error. The State, in turn, concedes it was error to inform the jury that Gallegos invoked his right to remain silent; however, it argues the error was not fundamental.

In *State v. Perry*, 150 Idaho 209, 245 P.3d 961 (2010), the Idaho Supreme Court clarified the fundamental error doctrine as it applies to allegations of prosecutorial misconduct. If the alleged misconduct was not followed by a contemporaneous objection, an appellate court should reverse when a defendant persuades the court the alleged error: (1) violates one or more of the defendant's unwaived constitutional rights; (2) the error is clear or obvious without the need for reference to any additional information not contained in the appellate record; and (3) the error affected the outcome of the trial proceedings. *Id.* at 226, 245 P.3d at 968.

The State concedes the first prong is met, as a constitutional right was implicated by the prosecutor's elicitation of improper testimony regarding Gallegos's silence and comments on that silence. Because it is dispositive, we turn to the third *Perry* prong concerning whether the error affected the outcome. Where a defendant seeks relief for a constitutional violation to which no objection was made in the trial court, the defendant bears the burden of showing a reasonable possibility the error affected the outcome of the trial. *Id.*; *State v. Whitaker*, 152 Idaho 945, 952,

277 P.3d 392, 399 (Ct. App. 2012). Whether trial errors could have affected the outcome of a trial generally depends, in part, upon the strength of the properly admitted evidence of guilt. *Whitaker*, 152 Idaho at 952, 277 P.3d at 399.

In this case, the evidence of Gallegos's guilt came from the testimony of the officers on the scene, Detective Holtry, and the physical evidence found in the vehicle and on Gallegos's person. The arresting officer testified Gallegos was the sole occupant of the vehicle when it was stopped. The second officer on the scene observed that Gallegos was behaving in a manner consistent with someone under the influence of a narcotic substance: "He had extremely rapid jerky movements, fidgeting, wringing his hands, having a very difficult time sitting still, bouncing around a lot." The officer noticed what he believed was a recent spill on Gallegos's shirt and pants, which Gallegos stated was coffee, and found a digital scale containing white powder residue in Gallegos's pocket, which Gallegos admitted to using to weigh the marijuana found in the vehicle (which he also claimed ownership of). When confronted with the fact marijuana is not a white, powdery substance, Gallegos insisted he did not know where the powder came from and stated the scales were borrowed.

The second officer further testified he found a nearly full, still warm, cup of McDonald's coffee in the driver's side cup-holder, that he always searches cups, and that it was the only cup he saw in the vehicle. Inside the cup was a pipe, of the type commonly used for methamphetamine, and nine small baggies of methamphetamine. Gallegos later told Detective Holtry that he stopped at McDonald's and purchased food and coffee shortly before being stopped. The detective also found a note card in Gallegos's wallet with writing appearing to be a drug ledger listing the then-current prices for methamphetamine.

Gallegos's defense at trial was that the methamphetamine was not his. He presented the testimony of three witnesses. Jeremy Anderson, a prison inmate and friend of Gallegos, testified that prior to Gallegos driving the vehicle and being arrested, Anderson and two friends borrowed the same vehicle and stopped at McDonald's to get coffee and food at approximately 4:45 a.m. Anderson testified he observed one of the friends place "something" in a coffee cup at a point the group believed they were about to be stopped by police. He also testified the three returned the vehicle at approximately 5 a.m. and the owner, Juanita Mallery, yelled at them because they were late returning it. In his rush to turn over the vehicle, he testified he forgot to remove his food and coffees from the vehicle. Mallery, a close friend of Gallegos, testified it was Gallegos

4

who received the vehicle back from Anderson, denied having yelled at Anderson, and indicated she was drinking heavily at the time. She also testified that after a neighbor alerted her that her vehicle was parked on the side of the road (where it was left when Gallegos was arrested) and returned the vehicle to her, she visited the site where the vehicle had been and noticed two McDonald's cups on the ground and wet spots where coffee was poured out. Mallery's neighbor and Gallegos's friend, Kim Pabawena, who discovered the vehicle parked on the side of the road after Gallegos had been arrested, also testified she saw two McDonald's cups on the ground near the vehicle and what appeared to be freshly poured liquid near the cups.

At trial, the State countered Gallegos's implication that the methamphetamine was left in the vehicle by one of Anderson's friends, pointing out Anderson testified he and his friends purchased the coffees at 4:45 a.m., but Gallegos was not stopped by police until 6:15 a.m. Thus, the coffee purchased by Anderson and his friends would not have been very warm, inconsistent with the warm coffee the officer testified he discovered. Further, the officer testified he only found one McDonald's cup in the car--consistent with Gallegos's statement to the detective that he had just stopped at McDonald's and purchased coffee and had spilled part of that coffee on himself prior to the stop. This evidence, the State argued, combined with other indicia tying Gallegos to the methamphetamine, proved beyond a reasonable doubt the methamphetamine belonged to Gallegos. In addition, the State pointed out that all three of Gallegos's witnesses were his friends, with the two women being close friends. The State also argued it defied common sense that someone would leave approximately $1300 worth of methamphetamine behind, floating in a coffee cup.

Our decision in *State v. Betancourt*, 151 Idaho 635, 262 P.3d 278 (Ct. App. 2011) is helpful in determining whether Gallegos has shown a reasonable possibility the error in this case affected the outcome and, thus, amounted to fundamental error. Betancourt was stopped by an officer for failure to display a front license plate. The officer asked where he was going and Betancourt responded that he had been sleeping in the passenger's seat of the vehicle when he heard gunshots, jumped into the driver's seat, and drove away. Betancourt admitted to carrying a concealed weapon for which he had a permit and declined the officer's request to allow the officer to retrieve the weapon from the vehicle. The officer noticed the strong odor of alcohol on Betancourt's breath and placed him under arrest for driving under the influence. An inventory

5

search of the vehicle revealed methamphetamine under the floor mat of the passenger's seat. Betancourt's blood later tested positive for methamphetamine.

On appeal, among other issues, Betancourt argued the prosecutor committed misconduct at trial by impermissibly commenting on Betancourt's exercise of his Fourth Amendment right to be free from unreasonable searches and seizures by declining the officer's request to retrieve the weapon in his vehicle. During closing argument, the prosecutor asked the jury to watch the video of the stop and to notice Betancourt's demeanor and that "[h]e did not want those troopers to search that vehicle." *Id*. at 639, 262 P.3d at 282. In rebuttal, the prosecutor again asked the jury to observe Betancourt's demeanor stating, "It speaks volumes about his concern about these troopers not getting into that car. He's trying to lead them astray and keep them out of that vehicle." *Id*. There was no contemporaneous objection to the statements, and after determining the statements constituted clear error in that they comprised prosecutorial misconduct implicating a constitutional right, we turned to the issue of whether Betancourt demonstrated there was a reasonable possibility the impermissible comments affected the outcome of the trial. We identified the key issue in the case as Betancourt's knowledge that the drugs were in the car and identified the State's evidence of a nexus between Betancourt and the methamphetamine: his admission to sleeping in the passenger's seat prior to the stop, a positive blood test for methamphetamine, his admission to being the last person to drive the car prior to the search, and his unusual and evasive behavior during the traffic stop. *Id*. at 641, 262 P.3d at 284. Noting that perhaps the strongest evidence linking Betancourt to the methamphetamine was his refusal to allow the officer to search the vehicle, we concluded we could not find beyond a reasonable doubt the prosecutor's impermissible comments regarding Betancourt's invocation of his Fourth Amendment rights did not contribute to the jury's verdict. *Id*.

Like in *Betancourt*, the prosecutor in this case improperly elicited testimony and commented on the defendant's invocation of a constitutional right and the pivotal issue in the case was Gallegos's knowledge of the methamphetamine. Compared to *Betancourt*, however, the evidence linking Gallegos to the methamphetamine was significantly stronger in this case: Gallegos was the only occupant of the vehicle and was acting in a manner consistent with someone under the influence of narcotics; he had on his person a scale with apparent drug residue that did not match the drugs he admitted to weighing with it; he admitted to possession of the marijuana also found hidden in the vehicle; the methamphetamine and pipe were found in a

6

McDonald's cup of "extremely warm" coffee in the driver's side cup holder and it was the only cup the officer found in the car; Gallegos testified that shortly before the stop he purchased coffee at McDonald's and spilled it on himself, which the officer confirmed; and a drug ledger was found in his wallet. Thus, unlike in *Betancourt* where we concluded the strongest evidence of Betancourt's knowledge of the drugs was his refusal to allow the officer to search the vehicle, there is a myriad of other evidence tying Gallegos to the drugs in this case.

Although Gallegos presented testimony of several witnesses to raise the possibility the drugs had been left in the vehicle by someone else, the testimony was offered by Gallegos's friends: at least one of those friends was part of the criminal milieu and another testified she had been drinking heavily at the time. The testimony was inconsistent on certain points and, most importantly, highly speculative, as it did not specifically tie anyone else to actual possession of the methamphetamine in the vehicle. Anderson testified merely that he saw his friend put "something" in a McDonald's cup on their way back to return the vehicle. The testimony also did not account for the officer's testimony that the coffee in which the drugs were found was very warm or that there was only one McDonald's cup in the vehicle at the time of the search. The officer's testimony was consistent with Gallegos's statement that he had just purchased McDonald's coffee prior to the stop, in contrast to testimony from Anderson that he and his friends purchased coffee at least one and a half hours prior to the stop. No serious questions were raised at trial as to the officer's credibility in this (or any) regard.

In this instance, we conclude that although the prosecutor's statements regarding Gallegos ending the interview with the detective when asked about the methamphetamine constituted serious misconduct--which we do not take lightly--given the significant amount of other evidence establishing Gallegos's guilt, we cannot say Gallegos has proved a reasonable possibility the impermissible statements affected the outcome of the trial. *See State v. Hairston*, 133 Idaho 496, 507-08, 988 P.2d 1170, 1181-82 (1999) (finding misconduct, but concluding the remaining evidence was so strong that there was not a reasonable probability the misconduct affected the outcome); *State v. Kerchusky*, 138 Idaho 671, 678, 67 P.3d 1283, 1290 (Ct. App. 2003) (finding the misconduct was harmless because extensive circumstantial evidence linked Kerchusky to the crime). *Cf. State v. Strouse*, 133 Idaho 709, 714, 992 P.2d 158, 163 (1999) (holding prosecutorial misconduct was not harmless where the prosecutor engaged in a very extensive inquiry into why the defendant failed to tell police his side of the story when being

7

interviewed, the case hinged on credibility, and there was significant evidence supporting both explanations); *State v. Lopez*, 141 Idaho 575, 578-79, 114 P.3d 133, 136-37 (Ct. App. 2005) (concluding prosecutorial misconduct was not harmless where the case hinged on the credibility of the victim and the defendant and was highly conflicting in nature). Accordingly, Gallegos's judgment of conviction for possession of a controlled substance with the intent to deliver and being a persistent violator is affirmed.

Chief Judge GRATTON and Judge LANSING **CONCUR.**